# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEVEL 4 YOGA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **C.A. No. 2020-0249-JRS** |
| | ) | |
| COREPOWER YOGA, LLC, | ) | |
| COREPOWER YOGA FRANCHISING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  December 23, 2021
Date Decided:  March 1, 2022

Lisa A. Schmidt, Esquire and Matthew D. Perri, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Michael Dockterman, Esquire, John J. Byron, Esquire, Cara Lawson, Esquire and Betsy Zyrkowski, Esquire of Steptoe & Johnson LLP, Chicago, Illinois; and Lia Metreveli, Esquire of Steptoe & Johnson LLP, Washington, DC, Attorneys for Plaintiff Level 4 Yoga, LLC.

Daniel B. Rath, Esquire, Rebecca L. Butcher, Esquire and Jennifer L. Cree, Esquire of Landis Rath & Cobb LLP, Wilmington, Delaware and Howard Graff, Esquire, Michael Cryan, Esquire, Bernice  K. Leber, Esquire, Eric A. Biderman, Esquire and Jacob M. Gilbert, Esquire of Arent Fox LLP, New York, New York, Attorneys for Defendants CorePower Yoga, LLC and CorePower Yoga Franchising LLC.

**SLIGHTS, Vice Chancellor**

According to the Centers for Disease Control and Prevention, the first case of the COVID-19 virus in the United States was "laboratory confirmed" on January 20, 2020.[1] Eight months before, in May 2019, Defendants, CorePower Yoga, LLC and CorePower Yoga Franchising, LLC (together, "CorePower"), exercised a pre-existing contractual "call option" to require one of its franchisees, Plaintiff, Level 4 Yoga, LLC ("Level 4"), to sell CorePower all of Level 4's assets, comprised mainly of yoga studios located in several states and the business components required to operate those studios under the CorePower Yoga brand (the "Transaction").

The parties' acquisition agreement was memorialized in an Asset Purchase Agreement ("APA"), dated as of November 27, 2019. According to the APA, the acquisition of Level 4's yoga studios was to occur in three tranches, with the first tranche to close on April 1, 2020. But as April 1 approached, and as businesses throughout the country began to "shut down" to manage exposure to COVID-19, either voluntarily or in response to government mandates, CorePower decided it wanted to delay or terminate the Transaction. Level 4 refused to delay and insisted that it stood ready and willing to honor its commitments under the APA.

---

[1] *See CDC Museum COVID-19 Timeline*, Centers for Disease Control and Prevention, https://www.cdc.gov/museum/timeline/covid19.html#:~:text=January%2020%2C%2020 20%20CDC,18%20in%20Washington%20state (last visited February 18, 2022).

Frustrated that Level 4 would not agree to delay closing, CorePower turned to the APA looking for ammunition to support its "delay or terminate" position. By then, CorePower had directed its franchisees, including Level 4, to shut down their yoga studios, just as CorePower had shut down the studios it owned and operated directly. With Level 4's studios now temporarily closed, on March 26, 2020, after invoking the APA's Material Adverse Effect ("MAE") clause and the APA's requirement that Level 4 continue to operate its yoga studios in the Ordinary Course of Business (as defined), CorePower declared that the APA was no longer valid because Level 4 had "repudiated" the contract such that CorePower was no longer obligated to perform.

In response, Level 4 invoked the operative franchise agreements and argued that it was bound by contract to follow the direction of CorePower, as franchisor, even if Level 4 did not agree with that direction. Operating its studios in compliance with the franchise agreements, as it had always done, was "ordinary course," said Level 4, and therefore, temporarily closing its studios at CorePower's direction was also "ordinary course." Moreover, according to Level 4, CorePower was ignoring that Level 4 was contractually obligated to sell to CorePower and that, in recognition of this unusual dynamic, the parties intentionally structured the APA as a "one-way gate" without any conditions to closing and without any right to terminate. Level 4

insisted on this structure to account for the fact that it was not a voluntary seller once CorePower exercised its right to force the sale of Level 4's highly profitable studios.

Following several rounds of back-and-forth saber-rattling, Level 4 demanded that CorePower close on time. CorePower refused. Unable to see the way to compromise, these purveyors of mindfulness launched what would become a nearly two-year, hard-fought litigation campaign against each other, culminating in a week-long trial during the summer of last year. "Everything zen? Everything zen? I don't think so. . . ."[2]

After carefully considering the evidence presented at trial, I am satisfied that the APA is structured, as Level 4 describes it, to effectuate a "one-way gate" through which the parties would pass on their way to inevitable closings. By agreeing not to include conditions to closing or express rights to terminate in their contract, the parties evidenced their intent to close the Transaction even if either party was in breach of the APA prior to the contractually-designated staggered closings.

Moreover, there are no common law bases to allow CorePower to back out of the one-way gate and refuse to close. Level 4 has not repudiated or materially breached the APA in any respect, and the purpose of the APA has not been frustrated. By following the directions of its franchisor, as it always has done, Level 4 operated

---

[2] Gavin Rossdale, *Everything Zen* (Interscope, ©BMG 1994).

its yoga studios in the Ordinary Course of Business when it closed them as directed by CorePower and as mandated by state and local governments. The preponderance of the evidence also reveals that the temporary closure of Level 4's studios did not meet the definition of Material Adverse Effect as stated in the APA and as applied under Delaware law.

Upon satisfying its contractual obligations, Level 4 was entitled to expect that CorePower would do the same. It did not. Instead, upon concluding that the Transaction was no longer in its best interests, and frustrated that Level 4 would not agree to delay closing, CorePower abruptly announced that its obligations under the APA had been "discharged." That was a material breach of the APA. Having so proven, Level 4 is now entitled to the benefits of its bargain.

## I. BACKGROUND

The following facts were either stipulated to by the parties before trial or proven by a preponderance of the evidence during trial.[3] I address which party bears the burden of proof in my analysis of the claims and defenses presented.

---

[3] I cite to the joint trial exhibits as "JX__"; the docket items as "D.I. __"; the trial transcript as "Tr. __ (witness name)"; the Joint Pre-Trial Stipulation and Order (D.I. 152) as "PTO [paragraph number]"; and depositions lodged as evidence as "(Name) Dep. __."

## A. Parties and Relevant Non-Parties

Defendants, CorePower Yoga, LLC and CorePower Yoga Franchising, LLC (together "CorePower"), are Colorado limited liability companies that in combination operate as the largest chain of yoga studios in the United States.[4] CorePower's network of yoga studios consists of both corporate-owned and franchisee-owned studios.[5]   Non-Party, TSG Consumer Partners LLC ("TSG"), is the majority owner of CorePower.[6]

Plaintiff, Level 4 Yoga, LLC, a Colorado limited liability company, became a franchisee of CorePower in 2007, and has since grown into the largest franchisee of CorePower-branded yoga studios.[7]  It operates its studios across six states under separate franchise agreements with CorePower.[8]

Several non-party fact witnesses offered relevant testimony at trial: (1) Christopher Kenny, co-founder and principal of Level 4, who served as Level 4's principal negotiator in connection with the Transaction,[9] (2) Edward Wong,

---

[4] PTO ¶¶ 29–30, 32.

[5] PTO ¶ 32.

[6] PTO ¶ 31.

[7] PTO ¶¶ 28, 33.  The APA provides that Delaware law governs the agreement and the parties consented to venue and jurisdiction in this Court.  PTO ¶ 27.

[8] PTO ¶ 34.

[9] PTO ¶ 80(a).

Managing Director of TSG and member of CorePower's board, who served as a principal negotiator for CorePower in connection with the Transaction,[10] (3) Sara Otepka, co-founder and CEO of Level 4,[11] (4) Karina Brett Jaros, director of financial planning and analysis at Level 4,[12] (5) Niki Leondakis, CorePower's CEO,[13] (6) Rebecca Pessin, CorePower's former CFO,[14] and (7) Michael Layman, managing director of TSG, member of CorePower's board and also a negotiator in connection with the Transaction.[15]

Level 4 called Jeffrey Mordaunt to testify as an expert witness regarding the transactional structure and allocation of risk agreed to by the parties, the operational representations and warranties in the APA, whether Level 4 experienced an MAE, the "financial and operational aspects of the material breach test set forth in the Restatement (Second) of Contracts," and damages.[16] Level 4 also presented the expert reports and deposition of Sheri Colosimo regarding "whether the actions that

---

[10] PTO ¶ 81(g).

[11] PTO ¶ 80(b).

[12] PTO ¶ 80(c).

[13] PTO ¶ 81(b).

[14] PTO ¶ 81(d).

[15] PTO ¶ 81(h).

[16] JX 644 at 2.

Level 4 took in the wake of the COVID-19 pandemic, including in the pre-Closing period, were consistent with past customs and practices."[17]

CorePower presented expert testimony from Jay C. DeCoons regarding standard operating procedures for yoga studios, an overview of CorePower's and Level 4's business operations before and after the COVID-19 pandemic, and the effects of the pandemic on the fitness industry generally and Level 4 specifically.[18] Robert F. Reilly testified as an expert witness on behalf of CorePower regarding whether Level 4 experienced a post-signing MAE and damages.[19]

## B. The Franchise Agreement

As noted, prior to the APA, the relationship between CorePower and Level 4 was governed primarily by a series of "nearly identical" franchise agreements (collectively, the "Franchise Agreement").[20] CorePower requires its franchisees to enter into its form franchise agreement before they can operate CorePower-branded yoga studios, and Level 4 was no exception.[21]

---

[17] JX 645 at 1; *see also* JX 670 (rebuttal report); JX 2017 (expert deposition).

[18] JX 661 at 3.

[19] JX 660 at 7.

[20] *See* JX 34 ("Franchise Agreement"); PTO ¶¶ 34–35; Tr. 11:7–12:1, 19:4–21 (Kenny).

[21] Tr. 998:2–16 (Wong).

In order to maintain consistency across its network of yoga studios, CorePower requires in the Franchise Agreement that franchisees, like Level 4, follow certain operational standards, referred to in the agreements as "System Standards."[22] The System Standards are the "standards, specifications, operating procedures, and rules that [CorePower] periodically prescribe[s] for operating a Studio,"[23] as set forth in the Franchise Agreement and CorePower's "Operations Manual."[24] Level 4's obligation to operate and maintain its studios in accordance with the System Standards is not discretionary, and it must adhere to the standards even when it "believe[s] that a System Standard is not in the Franchise System's or [its own] best interests."[25]

Certain provisions of the Franchise Agreement are particularly relevant here:

- *CorePower May Regulate Level 4's Days of Operation*: CorePower may regulate the days and hours of operation for Level 4's studios.[26]

---

[22] *See* Franchise Agreement §§ 4.4.1, 8.1.3; JX 52 at 8; Tr. 19:4–22:20 (Kenny); Tr. 298:9–299:3 (Otepka).

[23] Franchise Agreement § 4.3.

[24] JX 52 at 8. The Operations Manual includes "one or more separate manuals, as well as audiotapes, videotapes, compact discs, computer software, information available on an Internet site, other electronic media, bulletins and/or other written materials." Franchise Agreement § 4.3.

[25] Franchise Agreement § 8.1.1.

[26] Franchise Agreement § 8.1.2.7.

8

- *CorePower May Dictate Membership Terms*: CorePower may regulate Level 4's membership terms, including payment terms.[27] CorePower may also contact Level 4's members directly to inform them of studio closures and changes to payment terms.[28]

- *Compliance with Law*: Under the Franchise Agreement, Level 4 is required to operate its yoga studios "in full compliance with all applicable laws, ordinances and regulations."[29] Section 1.1 of the Franchise Operations Manual further reinforces this obligation.[30]

- *Adherence to Good Business Practice*: The Franchise Agreement requires Level 4 to adopt good business practices and to "refrain from any business . . . which may injure [CorePower's] business and the goodwill associated with the [CorePower brand] and other [CorePower studios]."[31]

The Franchise Agreement also imposes on Level 4 and its owners a two-year non-compete, non-solicitation and non-interference covenant that begins to run after the franchise relationship terminates.[32]

## C. The Call Option and the Call Option Agreement

In addition to setting operational standards, the Franchise Agreement gave CorePower the right, at its election, to purchase the yoga studios governed by the

---

[27] Franchise Agreement §§ 8.1.2.3, 8.4.

[28] Franchise Agreement § 8.4.4.

[29] Franchise Agreement § 8.7.1.

[30] JX 10 ("Franchise Operations Manual") § 1.1 (noting that "one [] brand standard is the requirement that owners adhere to all laws related to the operation of the Studio").

[31] Franchise Agreement § 8.7.2.

[32] Franchise Agreement §§ 15.6, 15.7.

Franchise Agreement upon the occurrence of certain events (the "Call Option").[33]

Concerned that CorePower might exercise this Call Option with respect to some but not all of Level 4's studios, and thereby leave Level 4 without the scale it had worked hard to achieve, Level 4 bargained for and obtained a commitment from CorePower that any exercise of the Call Option would cover all of Level 4's studios.[34]

To memorialize this commitment, on April 27, 2017, CorePower and Level 4 entered into a "Call Option Agreement" in which CorePower agreed that it would acquire *all* of Level 4's CorePower-branded yoga studios in the event it exercised its Call Option.[35] Under the Call Option Agreement, CorePower had thirty days from the triggering event to exercise its Call Option.[36] The purchase price associated with the option would then be determined under a formula set forth in Section 5 of

---

[33] *See* Franchise Agreement § 15.5. Relevant here, CorePower's "right to purchase [Level 4's] studio[s]" was triggered by a "Control Event," defined to include "a merger" or a "sale of all or substantially all" of CorePower's assets. *See* Franchise Agreement § 15.5.6. As discussed below, the parties stipulate that "TSG's purchase of CorePower was a Control Event. . . ." PTO ¶ 38.

[34] Tr. 34:10–20 (Kenny).

[35] *See* JX 18 ("Call Option Agreement").

[36] Call Option Agreement § 3.

the Call Option Agreement.[37]  Once calculated, CorePower was required to close on the Transaction and pay the prescribed purchase price within sixty days.[38]

### D. The Franchise Expansion Plan Agreement

On April 30, 2018, well before either party contemplated that CorePower would exercise its Call Option, CorePower and Level 4 entered into a Franchise Expansion Plan Agreement.[39]  This agreement gave Level 4 the right to develop at least eleven additional studios in Arizona, North Carolina, South Carolina and other markets (the "Development Studios").[40]  The Franchise Expansion Plan Agreement evidenced Level 4's long-term devotion to the CorePower brand and its intent to grow its already substantial network of CorePower yoga studios.

### E. CorePower Exercises Its Call Option

On April 2, 2019, TSG, a San Francisco-based private equity firm, purchased CorePower.[41]  This acquisition was a "Control Event" that triggered CorePower's Call Option and activated the Call Option Agreement,[42] giving CorePower's new

---

[37] Call Option Agreement § 5.

[38] Call Option Agreement § 3.

[39] JX 47 ("Franchise Expansion Plan Agreement").

[40] Franchise Expansion Plan § 3.

[41] PTO ¶ 37.

[42] PTO ¶ 38.

owner, TSG, the right to acquire all of Level 4's CorePower-branded studios.[43] TSG quickly determined that it wanted to exercise the Call Option with respect to Level 4 but it was not pleased with the Call Option Agreement's requirement that it take all of Level 4's studios at once.[44] The intake of more than 30 studios would pose serious integration challenges.[45] To minimize these challenges, CorePower asked for accommodations: staggered closings, the removal of certain Level 4 Development Studios not yet built from the acquisition, Level 4's commitment to "build out" certain other Development Studios before transferring them to CorePower, and Level 4's commitment to enter into a definitive acquisition agreement even though the Call Option Agreement did not require one.[46]

Level 4 was reluctant to agree to amend the Call Option Agreement it had bargained hard to secure.[47] CorePower's proposed changes meant delay and risk.[48]

---

[43] *See* Call Option Agreement § 2.

[44] Tr. 967:3–8 (Wong).

[45] *Id.*

[46] Tr. 902:11–903:4, 970:17–971:2 (Wong); Tr. 42:10–48:13 (Kenny).

[47] Tr. 42:10–43:12 (Kenny); Tr. 967:9–20 (Wong).

[48] Tr. 42:22–43:4 (Kenny) (discussing Level 4's belief that the Call Option Agreement had memorialized the parties' intent that once CorePower exercised the call option, all Level 4 studios would be transferred in a structure he characterized as a "one-way gate"); Tr. 47:24–48:21 (Kenny) (discussing Level 4's concerns with CorePower's proposed changes to the Call Option Agreement).

CorePower appreciated Level 4's concerns and was willing to make concessions to address them.[49] In May 2019, the parties entered into the Call Option Exercise Agreement, a modification of the Call Option Agreement, that incorporated the following elements: the "definitive agreement in respect of the acquisition" would not contain closing conditions or express rights to terminate, but would contain a post-closing indemnification regime; the Franchise Expansion Plan Agreement would be cancelled; CorePower would make certain payments in consideration for not acquiring certain Development Studios; and the parties would agree to revised valuations for other Development Studios to incentivize Level 4 to develop them well.[50]

After several months of negotiations, CorePower and Level 4 entered into the APA to memorialize the terms by which CorePower would acquire all of Level 4's assets.[51] Specifically, CorePower agreed to purchase thirty-four CorePower-branded yoga studios from Level 4.[52] Consistent with the Call Option Exercise Agreement, the Level 4 studios were to be delivered in tranches at staggered

---

[49] Pessin Dep. at 114:22–116:4; Tr. 914:16–915:9 (Wong).

[50] JX 131 (the "Call Option Exercise Agreement"); Tr. 43:5–12, 48:7–17, 49:14–50:23, 50:22–23, 52:10–19, 57:20–58:13, 66:19–67:7 (Kenny); Tr. 967:17–20, 971:3–16, 979:15–23, 983:4–19 (Wong).

[51] JX 149 ("APA").

[52] PTO ¶ 2.

closings, there were no closing conditions or express rights to terminate, certain Development Studios would not be part of the Transaction, and the valuation methodologies for certain studios, including other Development Studios, were modified from the valuation methodologies set forth in the Call Option Agreement.[53] The APA designates the tranches of studios as follows:[54]

| Tranche/Studio Type | Region | Number of Studios | Transfer Date |
|---|---|---|---|
| Tranche 1 | Colorado | 8 | April 1, 2020 |
| Tranche 2 | Arizona & North Carolina | 6 | July 1, 2020 |
| Development[55] | South Carolina, Arizona & North Carolina | 5 | July 1, 2020 |
| Tranche 1 | Illinois | 15 | October 1, 2020 |

## F. The APA

As noted, the parties executed the APA "as of November 27, 2019."[56] Several provisions are relevant here and summarized below.

---

[53] PTO ¶¶ 44–46; APA §§ 2.2.1, 2.2.4.; Tr. 903:20–904:3 (Wong).

[54] PTO ¶ 43. The chart in the APA, as replicated in the Pretrial Order, is confusing in that it describes the Colorado and Illinois studios as Tranche 1, even though the "Transfer Dates" for the studios are different. I have found no explanation for this apparent discrepancy in the trial record or in the parties' briefs.

[55] As for the Development Studios CorePower agreed to acquire, CorePower agreed to pay Level 4 a total of $3,212,623 for those studios upon the execution of the APA. PTO ¶ 46. CorePower made that payment on November 27, 2019. *Id.*

[56] APA at 1.

## 1. Level 4's Representations and Warranties

As is customary, Level 4 made certain representations and warranties in the APA concerning its yoga studios.[57]  Three are particularly relevant here.

### a. The Absence of Certain Developments

In Section 3.6, Level 4 represented that, "[s]ince January 1, 2019, the Business[58] has been conducted in the Ordinary Course of Business[59] (including promotional and marketing practices consistent with past practice) and [as relevant here], except for the matters disclosed on Schedule 3.6:"

- "There has been no material loss, destruction, damage or eminent domain taking (in each case, whether or not insured) affecting the Business or any Acquired Asset with a value in excess of $50,000;"[60]

- "[Level 4] has not . . . terminated any agreement or contract providing for the employment or engagement of any Person . . . or otherwise . . . terminated the employment or engagement of any foregoing persons, in each case other than in the Ordinary Course of Business . . . ;"[61]

---

[57] APA §§ 3–5.

[58] The APA defines "Business" to mean "the CorePower Yoga business conducted by the Seller."  APA Ex. A at 53.

[59] The APA defines "Ordinary Course of Business" to mean "action taken by any Person in the ordinary course of such Person's business which is consistent with the past customs and practices of such Person (including past practice with respect to quantity, amount, magnitude and frequency and standard employment policies and past practices with respect to management of cash and working capital)."  APA Ex. A at 59.

[60] APA § 3.6(a).

[61] APA § 3.6(c).

- "[Level 4] has not terminated or closed any facility, business or operation;"[62]

- "[Level 4] has not entered into, amended or terminated any lease or sublease of real property or any renewals thereof;"[63]

- "[Level 4] has not accelerated any accounts receivable or delayed any accounts payable, except in the Ordinary Course of Business;"[64] and

- "No event or circumstance has occurred which constitutes a Material Adverse Effect."[65]

### b. Compliance with Laws

In Section 3.11 of the APA, Level 4 represented and warranted that its business had been operated in compliance with the various legal requirements set forth in Sections 3.11.1 through 3.11.4.[66]  Significantly, at Section 3.11.1, Level 4 represented that it was not in "violation . . . in any material respect [of] any Legal Requirement," defined to include "any United States federal, state or local . . . law,

---

[62] APA § 3.6(e).

[63] APA § 3.6(i).

[64] APA § 3.6(j).

[65] APA § 3.6(l).

[66] APA § 3.11.

statute, standard, . . . ordinance, code, rule, regulation, . . . or any Government Order . . ."[67]

### c. Compliance with the Franchise Agreement

In Section 3.15.3, Level 4 represented and warranted that, as of each closing, it would not be "in breach of or violation of . . . any . . . Franchise Agreement."[68] And "Franchise Agreement" was defined to include all of the franchise agreements related to each yoga studio to be sold under the APA.[69]

### 2. Covenants

At Section 5 of the APA, Level 4 gave several covenants with respect to its operation of the Business until closing. One, in particular, is relevant here. In Section 5.1.1, Level 4 agreed that, "[f]rom the date of this Agreement until the final Closing," it would "conduct the Business only in the Ordinary Course of Business" (as previously defined) (the "Ordinary Course Covenant").[70]

---

[67] APA § 3.11.1; APA Ex. A at 58.

[68] APA § 3.15.3.

[69] APA Ex. A at 56.

[70] APA § 5.1.1.

### 3. No Closing Conditions or Express Right to Terminate

As noted, both parties acknowledge that the APA does not contain any express conditions to either party's obligation to close.[71]  Nor does it contain any provision expressly allowing for termination of the agreement, a force majeure clause, or any provision expressly allowing either party unilaterally to postpone any of the staggered closings.[72]

### 4. The Specific Performance Provision

Section 8.11 of the APA, entitled "Specific Performance," provides that both parties agree a breach of the APA will result in irreparable harm and, therefore, the parties may seek "to enforce specifically this Agreement."  The provision goes on to state that, in addition to specific performance, the parties may pursue "any other remedy to which [they] may be entitled, at law or in equity."[73]

---

[71] Wong Dep. at 115:22–24; *see generally* APA.

[72] *Id.*

[73] APA § 8.11.  CorePower maintains that the language to the effect that the parties may seek specific performance "in addition to any other remedy to which [they] may be entitled, at law or in equity" is tantamount to a termination clause in that either party would possess a common law right to terminate if the counter-party materially breached the contract. I address that argument below.

Upon executing the APA, the parties turned their focus to the first of the staggered closings to be held on April 1, 2020. As discussed below, that closing never occurred.

## G. CorePower Requires the Temporary Closure of Level 4 Yoga Studios to Manage COVID-19 Risks

In January 2020, the COVID-19 virus began to spread rapidly across the United States.[74] By January 31, 2020, the Department of Health and Human Services had declared a public health emergency for the entire country.[75] Nearly six weeks later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[76] And two days after that, on March 13, 2020, former President Donald Trump declared the COVID-19 pandemic a national emergency.[77]

On March 15, 2020, to manage the risk of COVID-19 exposure, CorePower announced that all CorePower-branded yoga studios, including those operated by Level 4, would close for two weeks beginning on March 16, 2020.[78] CorePower did

---

[74] PTO ¶ 52.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] PTO ¶¶ 53, 55. CorePower notified Level 4's CorePower members of the temporary closures directly. PTO ¶ 53.

not seek Level 4's consent to the closures because, under the Franchise Agreement, it was not required to do so.[79] Following CorePower's March 15 announcement, Level 4 closed its thirty-four yoga studios as directed.[80] Through MindBodyOnline (CorePower's online scheduling tool), CorePower erased the class schedules for all of Level 4's studios and caused the Level 4 website to display the message: "Temporarily Closed."[81]

CorePower's management understood that these closures could create internal liquidity issues and, to protect itself from a liquidity crisis,[82] CorePower drew down $36.5 million on its delayed-draw term loan facility.[83] As a condition to obtaining the loan, CorePower certified to its lenders that, as of March 19, 2020, its business

---

[79] *See* Franchise Agreement § 8.1 ("Therefore, you agree at all times to operate and maintain your Studio according to all of our System Standards, as we periodically modify and supplement them, even if you believe that a System Standard is not in the Franchise System's or your best interests."); Tr. 342:4-343:8 (Otepka) (commenting that after the CEO of CorePower announced that CorePower yoga studios were closed, Level 4 had to close its CorePower-branded studios because "you can't tell your customer one thing and then do something else. So, in this case, you know, the CEO of CorePower said, we're closing all our studios. It was not a decision for me to be made to say, Nope. I'm Sara. I'm doing something different.").

[80] PTO ¶ 56.

[81] Tr. 119:9–125:6 (Kenny).

[82] Tr. 1282:17–24 (Leondakis).

[83] JX 224; PTO ¶ 58.

had not experienced and was not reasonably expected to experience a Material Adverse Effect, as defined in the credit agreement.[84]

CorePower's board of directors held a meeting on the morning of March 20, 2020, during which management forecasted that CorePower's COVID-19 related studio closures would now last six weeks instead of the two weeks originally anticipated.[85]  That forecast proved prescient as state and local governments began to issue proclamations in various forms, typically at the executive level, mandating that certain businesses, including commercial fitness centers, close to the public.[86]

At the conclusion of its March 20 meeting, the CorePower board decided to delay the Level 4 acquisition.[87]  A few hours after the meeting, on the evening of March 20, 2020, Wong sent an email to Kenny stating that CorePower and TSG believed Level 4 was not operating in the Ordinary Course of Business, as required by the APA, because Level 4 had temporarily closed its yoga studios in response to

---

[84] *See* JX 224; JX 120; Pessin Dep. at 165:5–166:11; Tr. 1093:17–1094:2 (Wong); Tr. 1303:21–1306:16 (Leondakis).

[85] JX 257 at 3.

[86] *See* JX 246; JX 247; JX 253; JX 263; JX 266; JX 301; Tr. 343:9–12 (Otepka).

[87] Tr. 1292:14–1293:21 (Leondakis).

COVID-19.[88]  Wong ended his email by proposing that the parties consider adjourning the closing dates under the APA.[89]

Two days later, on March 22, 2020, Kenny responded to Wong's email, expressing his disagreement with Wong's assertion that Level 4 was operating outside the Ordinary Course of Business.[90]  Kenny also assured Wong that Level 4 was ready to transfer its assets on the schedule agreed to in the APA and expected CorePower to consummate the Transaction.[91]  On March 26, 2020, four days after Kenny's response to Wong, Michael Layman, a CorePower board member and managing director at TSG, emailed Kenny to advise Level 4 that CorePower and TSG believed Level 4 had "disavow[ed]" the following Representations and Warranties and Covenants in the APA:

- "There ha[d] been no material loss, destruction, damage or eminent domain taking . . . affecting the Business or any Acquired Asset with a value in excess of $50,000" (Section 3.6(a) of the APA);

- Level 4 had not "terminated or closed any facility, business or operation" (Section 3.6(d) of the APA);

- "No event or circumstances ha[d] occurred which constitutes a Material Adverse Effect" (Section 3.6(1) of the APA); and

---

[88] JX 273 at 2.

[89] *Id.*

[90] JX 273 at 1–2.

[91] JX 273 at 2.

22

- Level 4 would conduct its business in the Ordinary Course of Business (defined as "consistent with past customs and practices") (Section 5.1.1 of the APA).[92]

The email also advised Level 4 that, "[i]t is now [CorePower and TSG's] view that [CorePower and TSG's] contractual performance has been discharged" due to Level 4's "repudiation" of its obligations under the APA.[93]

During a brief conference call held shortly after Layman's email was received, TSG and CorePower reiterated their position to Level 4 and declared that CorePower would not close the Transaction.[94] Four days later, on March 30, 2020, Nikki Leondakis, CorePower's CEO, sent yet another email to Kenny, again reiterating CorePower and TSG's position: "Level 4 Yoga, LLC has repudiated multiple material obligations embodied in the Asset Purchase Agreement thereby . . . discharging our obligations thereunder."[95] When the time came to close on the first tranche of yoga studios on April 1, 2020, only Level 4 showed up to the virtual closing table.[96]

---

[92] JX 288 at 1.

[93] *Id.*; Layman Dep. at 226:2–25.

[94] Tr. 1084:15–1085:6 (Wong).

[95] JX 303; PTO ¶ 65.

[96] PTO ¶ 66; Leondakis Dep. at 280:23–281:5.

## H. Level 4's Post-April 1 Operations

After the failed closing on April 1, 2020, Level 4 began to take a number of cost-saving measures to preserve what it now believed to be CorePower's assets "as steward" of those assets and to mitigate damages.[97] These included temporary studio closures,[98] laying off or furloughing a majority of its workforce,[99] and restructuring its leases.[100] Level 4 also continued to satisfy its obligation under Section 2.5.1 of the APA to provide CorePower with estimated balance sheets for each of the subsequent scheduled closings.[101] CorePower never responded to Level 4's emails transmitting the estimated balance sheets, nor did it attend any of the subsequent staggered closings.[102]

## I. Procedural History

Level 4 filed this lawsuit on April 2, 2020, the day after the first closing was scheduled to occur, claiming that CorePower breached the APA in March 2020 by refusing to close on the Transaction, failing to deliver certain required payments

---

[97] Tr. 111:8–9 (Kenny).

[98] *E.g.*, Tr. 191:14–18, 207:11–208:1 (Kenny).

[99] *E.g.*, Tr. 403:3–405:1 (Otepka); JX 316; JX 342.

[100] *E.g.*, JX 292; JX 293.

[101] *See* APA § 2.5.1; Tr. 492:17–493:9 (Jaros); JX 291; JX 417; JX 467.

[102] Tr. 113:4–114:7 (Kenny).

under the APA, and ultimately failing to take possession of Level 4's yoga studios.[103]

Level 4 requested declaratory relief, specific performance and damages, including damages incurred by having to maintain the yoga studios while CorePower refused to perform under the APA.[104]

CorePower brought a motion to dismiss the initial complaint,[105] which the Court denied.[106] Level 4 subsequently filed a Verified First Amended Complaint on August 28, 2020,[107] and a Verified Second Amended Complaint (the operative Complaint) on November 5, 2020.[108] CorePower filed its Answer, Affirmative Defenses, and Amended Verified Counterclaims on December 14, 2020.[109] Level 4 moved to dismiss CorePower's counterclaims, which motion the Court granted in part and denied in part.[110]

---

[103] D.I. 1; PTO ¶ 6.

[104] PTO ¶ 6.

[105] D.I. 4.

[106] D.I. 29.

[107] D.I. 31.

[108] D.I. 46. (Verified Second Am. Compl.) ("Complaint").

[109] D.I. 50 (Answer, Aff. Defs. and Verified Countercls. of Defs. CorePower Yoga, LLC and CorePower Yoga Franchising, LLC) ("CorePower Counterclaim"); PTO ¶ 19.

[110] PTO ¶ 20.

The Court convened a five-day trial from August 9 through August 13.[111] The parties presented their closing arguments on December 9, 2021, and, after supplemental briefing, the matter was deemed submitted for decision on December 23, 2021.[112]

## II. ANALYSIS

The parties seek competing declaratory judgments—Level 4 seeks a declaration that the APA is valid and enforceable and that CorePower is in breach of the agreement; CorePower seeks a declaration that Level 4 repudiated or materially breached the APA pre-closing such that CorePower was excused from performing. If the Court determines that CorePower breached the APA, Level 4 seeks a decree of specific performance that would compel CorePower to close on all of the Level 4 yoga studios per the APA and an award of damages caused by the breach.[113] For its part, in addition to seeking declaratory relief, CorePower asserts a claim for breach of contract or, alternatively, sounding in "quasi-contract" to recover payments made by CorePower to Level 4 related to the Development Studios after the APA was signed.[114]

---

[111] D.I. 170–74.

[112] D.I. 198 ("Post-Trial Oral Arg."); D.I. 199–200.

[113] Complaint at 25.

[114] CorePower Counterclaim at 68.

26

While the parties' relationship was forged long before CorePower exercised its Call Option and initiated the Transaction, the claims and counterclaims arise from the APA. It is, therefore, appropriate to focus the analysis there. With that said, when undertaking to construe a contract, our Supreme Court has instructed that the trial court must consider "[t]he basic business relationship between [the] parties" so that it can "give sensible life" to the agreement.[115] Accordingly, I begin my deliberations by reviewing the parties' pre-APA relationship and the context in which they negotiated the APA before turning to the contractual language.

"With the [APA's] commercial context in hand, and mindful that my understanding of the parties' contractual relationship cannot overwrite an unambiguous contract,"[116] I turn to whether the APA, as written, represents a "one-way gate" to closing, as Level 4 construes it, or whether the parties included off-ramp provisions in the APA, as Core Power believes, that would allow a party to elect not to consummate the Transaction in certain circumstances. As explained below, the APA unambiguously contains no conditions to closing and no express

---

[115] *Chi. Bridge & Iron Co. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017).

[116] *Pearl City Elevator, Inc. v. Gieseke*, 2021 WL 1099230, at *9 (Del. Ch. Mar. 23, 2021), *aff'd*, 265 A.3d 995 (Del. 2021) (citing *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018)); *see also Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015) ("[O]ur courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering.").

right for either party to terminate the contract pre-closing. Nor are there provisions in the APA that somehow imply a pre-closing right to terminate.

Having concluded that the APA is indeed a one-way gate, I next address CorePower's assertion that, even though the APA provides no express right to avoid closing, its performance was excused under the common law because Level 4 repudiated or materially breached the APA and because the purpose of the APA was frustrated. Rejecting these contentions as factually unsupported, I conclude that CorePower was, both as a matter of contract and as a matter of common law, obliged to close and that its refusal to do so was a breach of the APA.

Finally, I discuss the remedies to which Level 4 is entitled. As explained below, the Court's verdict and final judgment will include a decree of specific performance and an award of damages with pre-judgment and post-judgment interest.

## A. The Parties' Pre-Signing Business Relationship

More so than usual, the pre-signing relationship between this buyer and this seller directly informs my analysis of the parties' competing claims of breach of contract. In fact, as discussed below, the parties' significant pre-signing relationship directly influenced the timing and structure of the APA and the conduct of Level 4, as seller, after signing.

28

The franchisor/franchisee relationship is animated by the franchisor's need "to drive consistency across its stores."[117] To accomplish the goal of consistency, the franchisor requires the franchisee to adhere to certain standards, referred to within the CorePower network as "System Standards," that, in essence, "instruct [the] franchisees [how] to behave."[118] Given that Level 4 cannot operate CorePower-branded studios without a franchise agreement, it must comply with the System Standards or lose the requisite authorization to run its business.[119] Significantly, this obligation to comply with the Franchise Agreement and its System Standards continued during the post-signing/pre-closing period, and CorePower sought and obtained from Level 4 a representation in the APA that Level 4 had

---

[117] Tr. 19:15–16, 21:3 (Kenny).

[118] Tr. 12:13–12:15 (Kenny). *Cf. Billops v. Magness Const. Co*., 391 A.2d 196, 197 (Del. 1978) (noting that "franchise agreements, in general, attest to the skill of corporate counsel in reserving as many rights in the franchisor as is possible to maintain control and to protect the product and service covered by the trademark or tradename," and holding that, in some instances, the degree of control exercised over the daily operations of the franchisee can create "an agency relationship" between franchisor and franchisee).

[119] Tr. 998:2–16 (Wong) ("Q. Well, how do you – I mean, legally, how do you establish a relationship with a franchisee, Mr. Wong? A. We have a franchise agreement with them. Q. And in the absence of a franchise agreement, can the franchisee operate as a CorePower Yoga studio? A. No, they can't brand it a CorePower Yoga studio."); Tr. 298:9–12 (Otepka) ("[Being a] franchisee of the franchisor gives us the right to own and operate under their trademark and gives us a playbook which we follow to operate.").

remained in compliance with the Franchise Agreement pre-closing.[120] In other words, unlike the typical "busted deal" case, CorePower, as buyer, had the contractual right to direct, in large measure, how Level 4, as seller, operated its business post-signing and pre-closing.

The franchisor/franchisee relationship between CorePower and Level 4 is marked by another feature relevant here—the Call Option, the Call Option Agreement and the Call Option Exercise Agreement. Again, this is not the typical "busted deal" case where the story begins with a willing buyer and willing seller. Indeed, Level 4 was not looking to sell.[121] Its studios were highly profitable and it had entered into the Franchise Expansion Plan Agreement that paved the way for it to grow its already extended family of CorePower-branded yoga studios even further.[122] Nevertheless, as a condition to becoming a CorePower franchisee, Level 4 had agreed to provide CorePower a Call Option that, when exercised, would

---

[120] APA § 3.15.3; *see, e.g.*, PTO ¶ 34; Tr. 302:6–18 (Otepka); Tr. 1306:23–1307:16 (Leondakis) ("Q. Is it fair to say that as the franchisor, CorePower expects Level 4 to operate its yoga studios in accordance with the franchise agreements? A. Yes.").

[121] Tr. 41:12–43:12 (Kenny) (recalling when he was notified that CorePower was going to exercise its call option and describing the CorePower-branded studios as the Level 4 owners' "core asset").

[122] Tr. 9:5–21 (Kenny) (describing the purpose of the Franchise Expansion Plan Agreement); Tr. 32:9–35:2 (describing how the Franchise Expansion Plan Agreement was mutually beneficial to CorePower's original owner and Level 4); Tr. 142:15–143:9 (Kenny) (confirming Level 4's revenue pre-COVID-19); *see also* JX 146.

30

require Level 4 to sell its yoga studios back to CorePower.[123]  That obligation was refined in the Call Option Agreement, where CorePower agreed that if it exercised its Call Option, it would do so as to all of Level 4's yoga studios.[124]

When TSG acquired CorePower, it inherited the Call Option right but also the obligation that it acquire all Level 4 studios, not just a few.[125]  That posed a challenge for TSG.  Level 4 was CorePower's largest franchisee.  When TSG exercised the Call Option, it was just "24 days into [its] ownership period, and [it] needed time to figure out how to digest the fact that Level 4 was 20 percent of the stores in the system and put together a plan to take those [studios] into the system."[126]  As Kenny credibly testified, Layman approached Kenny to deal with the integration challenges and told him, "[w]e want some things, and we're willing to give some things."[127]

What CorePower wanted, and received, was an agreement to acquire the Level 4 studios in tranches, with Level 4 agreeing to manage the studios

---

[123] *See* Franchise Agreement § 15.5.

[124] Tr. 901:1–902:17 (Wong) (recognizing that after the occurrence of a "Control Event" CorePower had the "ability to effectively call and acquire Level 4").

[125] Tr. 902:11–24 (Wong) (acknowledging that under the Call Option Agreement CorePower was obligated to acquire all of Level 4's studios at the same time).

[126] Tr. 42:14–18 (Kenny).

[127] Tr. 42:11–12 (Kenny).

(for payment) until the studios were transferred.[128]  In exchange, Level 4 asked for, and CorePower agreed to give, an acquisition agreement with "no closing conditions" and "no force majeure"; "[the] transaction ha[d] to close."[129]  As Kenny credibly described it, the deal structure Level 4 bargained for, as previewed in the Call Option Exercise Agreement, was one where the APA would be the visage of a "one-way gate."[130]  This structure was "consistent with the call option all the way through."[131]

## B. The One-Way Gate

"While [our courts] have recognized that contracts should be read in full and situated in the commercial context between the parties, [as noted], the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[132]  Accordingly, "[a]s is the Delaware way, I turn to the

---

[128] Tr. 42:6–43:20, 169:1–8 (Kenny); Tr. 902:17–903:19 (Wong).

[129] Tr. 43:5–7 (Kenny).  *See also* Tr. 914:13–916:2 (Wong) (acknowledging that the APA was structured to omit express closing conditions or express rights to terminate).

[130] Tr. 43:1, 43:12, 52:18 (Kenny).  The Call Option Exercise Agreement set forth terms to be incorporated within a "definitive agreement in respect of the acquisition."  JX 131 § 3.6. Those terms did not include conditions to closing or express termination provisions. *Id.* at Ex. B.

[131] Tr. 52:18–19 (Kenny).

[132] *Town of Cheswold*, 188 A.3d at 820.

words the parties agreed to in their contract [for] the best evidence of their intent."[133]

As explained below, those words and the words intentionally omitted, speak volumes about who is in breach and who is not.

### 1. No Closing Conditions or Express Right to Terminate

Not surprisingly, CorePower maintains that it never would have agreed to sign the APA if the contract required it to close no matter what.[134] But that position is hard to reconcile with CorePower's failure to secure any of the typical provisions that would allow a party to refuse to close under contractually identified circumstances.[135] Not a single one—there are no conditions to closing, no express termination provisions, and no termination or reverse termination fees; there is not even a force majeure clause.[136] Indeed, with respect to the staggered closings, while

---

[133] *Pearl City*, 2021 WL 1099230, at *12.

[134] Tr. 915:16–916:2 (Wong); Defs. and Countercl. Pls. CorePower Yoga, LLC and CorePower Yoga Franchising LLC's Post-Trial Opening Br. ("CPY OB") (D.I. 184) at 27–29.

[135] Tr. 43:5–12, 66:19–67:2 (Kenny); Tr. 967:17–20 (Wong); *see generally* the Call Option Exercise Agreement; the APA; *cf.* Lou R. Kling & Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 13.01 (2013) ("Kling & Nugent") (observing that "the representations, the covenants and the closing conditions in the acquisition agreement should be carefully woven together"); *id. at* § 14.01 (stating that "[o]nce the agreement has been signed, a party is obligated to consummate the transaction unless one or more of the conditions to its obligation to close are not satisfied at the time set for closing," and noting that acquisition agreements that "have the fewest and the most limited [closing] conditions are known as 'hell or high water' agreements").

[136] Tr. 66:24–67:7 (Kenny) (explaining that "there are no exits to [the APA]. There's no closing conditions. There's no force majeure."); Tr. 914:15–915:9 (Wong) (acknowledging that because of Level 4's focus on the certainty that the Transaction close,

33

there is no right to *avoid* them, the APA does allow CorePower to *accelerate* them at its election.[137]  The absence of any contractual condition to closing or express

CorePower "agreed to drop the closing conditions.  But [CorePower] would not agree to drop the reps and warranties, which [it] thought was a baseline of what [it] would at least expect to receive.").  In this regard, CorePower argues that the representations and warranties in the APA "embody a 'bring down' provision" that, in essence, assured CorePower that the "business of the target will be substantially the same at the date of closing as it was on the date the purchase agreement was signed" and served to induce it to enter the APA.  *See* CPY OB at 27 (citing *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *74 (Del. Ch. Nov. 30, 2020), *judgment entered*, (Del. Ch. 2021), *and aff'd*, 2021 WL 5832875 (Del. Dec. 8, 2021)); APA § 3 (stating that "in order to induce the Buyer to enter into and perform this Agreement and to consummate the Contemplated Transactions, the Seller hereby represents and warrants to Buyer, as of the date hereof and as of the applicable Closing Date, as follows:").  The argument is not persuasive.  I note that the only evidence of actual inducement was offered by Wong in response to highly leading questions.  *See, e.g.*, Tr. 917:9–9:18:6; 1115:13–1121:8 (Wong).  More importantly, the inducement language in the preface to Section 3 is a far cry from the typical condition to closing language that this APA conspicuously lacks.  *Cf. AB Stable VIII LLC,* 2020 WL 7024929, at *1, 29, 33, 52 (discussing at length conditions to closing and distinguishing them from the operative agreement's "bring-down condition"); *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *2–3, 18, 45 (Del. Ch. Oct. 1, 2018) (discussing contractual conditions to closing), *aff'd*, 198 A.3d 724 (Del. 2018); *Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *14 (Del. Ch. July 9, 2021) (same); *Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *23–24 (Del. Ch. Apr. 30, 2021) (same).  A closing condition expressly makes the truth of the representation(s) a condition to closing.  *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12–13 (Del. Ch. July 11, 2011).  No such provision appears in the APA.

[137] Section 2.3 of the APA provides that each closing: "will take place on the dates set forth on Exhibit D hereto (each, a "Closing Date").  Notwithstanding the foregoing, the Buyer may elect to consummate any Closing for the Tranche 1 Studios, Tranche 2 Studios or Development Studios at any time prior to the applicable date set forth on Exhibit D by providing the Seller with written notice of such new Closing Date at least 75 days prior thereto."

34

termination right is potent evidence of the parties' intent here and supportive of Kenny's "one-way gate" descriptor.[138]

This is not to say that the APA left CorePower without recourse should Level 4 breach its representations and warranties pre-closing. On the contrary, the APA contains a purchase price adjustment clause,[139] and a hearty post-closing indemnification regime.[140] Additionally, because the APA does not contain an anti-

---

[138] *See* Kling & Nugent §14.01 n.3 (citing to Restatement (Second) of Contracts §§ 237, 239 (1981); Farnsworth, Contracts § 8.15 (1990)) ("There is clear authority to the effect that a party is not obligated to perform its obligations under an agreement if the other party is in material breach of its obligations. However, the issue is essentially one of contractual intent. Consequently, if the parties did not include any conditions to their obligations to close, the issue would be one of whether the omission evidenced an intent to require closing notwithstanding the breach.") (internal citations omitted); *Julian v. E. States Const. Serv., Inc.*, 2008 WL 2673300, at *15 (Del. Ch. July 8, 2008) (noting that the absence of contractual language in the operative contract used in similar agreements that were proffered as evidence of the parties' intent was "striking"); *Casey Empl. Servs., Inc. v. Dali*, 634 A.2d 938, at *3 (Del. 1993) (TABLE) (discussing the extent to which the absence of contractual language, in certain circumstances, can be evidence of the parties' intent); *Gluckman v. Holzman*, 51 A.2d 487, 491 (Del. Ch. 1947) (Seitz, Vice Chancellor) (observing that the lack of contractual provision with respect to "time of performance" was presumptive evidence that the parties intended performance to be made "within a reasonable time"). *But see Levy Fam. Inv., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *10 (Del. Ch. Jan. 27, 2022) (observing in the context of a form promissory note that, given the likely lack of negotiation surrounding the agreement, the lack of a "superseding clause" did not necessarily reflect an intent that the promissory did not "supersede" prior note agreements).

[139] APA § 2.5.5.

[140] APA § 6.1.1. Indeed, as contemplated in the Call Option Exercise Agreement (JX 131, Ex. B), the APA acknowledges that CorePower had coverage under a Representations and Warranty Insurance Policy. APA §§ 5.2, 5.15, 6.1.1. And CorePower bargained expressly for the right to pursue indemnification from Level 4 for any claim "excluded from coverage under the R&W Insurance Policy." APA § 6.1.1(d); Tr. 1137:11–1138:3 (Wong). Relatedly, Level 4 points out that, under Section 6.8, CorePower's only remedy post-

35

sandbagging provision,[141] nothing expressly prevented CorePower from closing on a tranche of studios and then seeking indemnification for a known breach.[142] While the indemnification provisions are not conclusive evidence that the parties intended to close come-what-may, they do fit well within Level 4's view that CorePower had agreed to close on the Level IV studios upon exercise of its Call Option, and support Kenny's credible description of the APA's "one-way gate."

---

closing is indemnification. CorePower responds that Level 4's reliance on Section 6.8 is misplaced because Section 6.8 applies only after a Closing has occurred; it does not affect the buyer's pre-closing rights. D.I. 150 at 28; CPY OB at 82. Section 6.8 is titled "Exclusive Remedy" and provides that "[t]he Seller and the Buyer each acknowledge and agree that from and after the applicable Closing, excluding any claim for injunctive or other equitable relief, the indemnification provisions of this ARTICLE VI are intended to be the sole and exclusive remedy with respect to any and all claims relating to the subject matter of this Agreement and the Contemplated Transactions." APA § 6.8. Ultimately, I need not address the relevance of Section 6.8 as my construction of the contract does not rely on that provision.

[141] Tr. 1137:11–1138:3 (Wong).

[142] *See NASDI Hldgs. v. N. Am. Leasing*, No. 10540-VCL, at 57 (Del. Ch. Oct. 23, 2015) (TRANSCRIPT) (observing that "Delaware is what is affectionately known as a 'sandbagging' state"); *Cobalt Operating, LLC v. James Crystal Enter., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007) ("[A] breach of contract claim is not dependent on a showing of justifiable reliance. . . . Having contractually promised [the buyer] that it could rely on certain representations, [the seller] is in no position to contend that [the buyer] was unreasonable in relying on [the seller's] own binding words."), *judgment entered*, (Del. Ch. 2007), and *aff'd*, 945 A.2d 594 (Del. 2008). *But see Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209 n.185 (Del. 2018) (acknowledging that the issue of sandbagging is not resolved in Delaware).

36

## 2. Allowing Termination of the APA Pre-Closing Produces Absurd Results

Level 4's one-way gate construct is also entirely consistent with the untenable consequences of a failure to close. As Level 4 correctly points out, under the APA, the Franchise Agreement terminated on "the applicable *Closing Date*," not upon the applicable "*Closing*."[143] In other words, if CorePower did not close on the first closing date (April 1), then, as of April 2, Level 4 would still be the owner of the studios that should have been acquired by CorePower, but the Franchise Agreement associated with those studios would be terminated. Of course, Level 4 cannot operate a CorePower-branded yoga studio unless it does so under a valid franchise agreement with respect to that particular studio.[144] To require that Level 4 hold CorePower-branded studios without being able to operate them, or that it turn elsewhere for a banner under which its studios could operate, are absurd results that, according to the evidence, neither party intended.[145] This is further evidence that the parties entered into the APA intending to close on the Transaction without limitation.

---

[143] APA § 2.1.6 (emphasis added); *see also* Tr. 1000:18–1001:18 (Wong) (recognizing that the defined term "Closing Date" refers to an agreed-upon calendar date).

[144] Franchise Agreement §§ 14.2, 15.2.

[145] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."). The parties appeared to appreciate that Level 4 could not and would not continue to own and operate CorePower-branded yoga studios after the Closing Date. *See, e.g.*, Tr. 1329:24–1395:20 (Kenny) (discussing absurd results if APA did not close); Tr. 1019:14–19 (Wong) (stating that at

## C. No Basis in the Contract to Terminate

CorePower counters Level 4's one-way gate theory by attempting to transfigure the APA's boilerplate "Specific Performance" provision into an express contractual tunnel out of the bargain it struck,[146] and by arguing that the so-called "materiality scrape" that modifies the APA's indemnification provisions somehow reflects the parties' intent to allow a party to terminate pre-closing.[147] For the reasons explained below, I reject both arguments.[148]

### 1. Section 8.11

It is difficult to accept that CorePower would bury its supposedly bargained-for express right to terminate the APA within a boilerplate provision entitled "Specific Performance" that appears within other "MISCELLANEOUS" provisions of the contract.[149] In fact, neither the word "terminate" nor any synonym of that

---

the time the APA was drafted he viewed the prospect of a breach as "highly unlikely"); Tr. 1001:13–18 (Wong) ("Q: And if you didn't think for sure the closings were going to occur on those dates, the franchisor, you, never would have allowed your franchisee to terminate the franchise agreement on those dates, would you? A: That is correct.").

[146] APA § 8.11.

[147] CPY OB at 29.

[148] As noted above, I was not persuaded by CorePower's argument that Level 4's representations constitute a "bring down" provision. This argument was another post-hoc attempt by CorePower to find a nonexistent contractual exit off the one-way street to closing.

[149] APA §§ 8, 8.11.

word appear in Section 8.11 or, with respect to a right to terminate the APA at least, anywhere else in the APA. But, even if I were to accept that the parties intended Section 8.11 to do the work CorePower would have it do here, as explained below, Level 4 did not materially breach the APA and, consequently, CorePower enjoys no "other remedy . . . at law or in equity" that would justify its refusal to close.[150]

## 2. The Materiality Scrape

Likewise, CorePower's argument regarding the so-called "materiality scrape" is unpersuasive. Specifically, CorePower contends that because the APA's indemnification provision removes any materiality qualifiers from the APA's representations and warranties,[151] this somehow evidences the parties' intent to allow a party to terminate the agreement before closing.[152] In CorePower's view, if this interpretation is rejected, then the "warranties given by [Level 4] that were qualified as to materiality" and the No-MAE Representation would be rendered meaningless because those words are specifically deleted in the post-closing indemnification context; thus, "the only application under the APA of those

---

[150] APA § 8.11. At best for CorePower, Section 8.11 might be read to incorporate default common law rules into the parties' contractual relationship. That, of course, was unnecessary; as explained below, contracting parties always bargain in the shadow of the common law, unless they choose expressly to disclaim it.

[151] APA § 6.1.1(a).

[152] CPY OB at 29.

warranties (including the MAE warranty) is <u>before</u> closing."[153]  In other words, because materiality is not a condition to a post-closing indemnification claim, the parties must have included "materiality" within the representations and warranties for some other purpose—namely, to reflect those representations that, if breached, would justify pre-closing termination of the agreement.  I disagree.

If the representations and warranties were included only to define the indemnification claims CorePower could bring against Level 4, then CorePower's interpretation *might* have more persuasive force.  But the representations and warranties made by Level 4 serve more than one purpose.  In addition to defining the scope and nature of post-closing indemnification claims available to CorePower, among other functions, the materiality qualifiers within the representations and warranties define the scope of what must be disclosed on the disclosure schedules to the APA and the circumstances in which a party can seek specific performance or injunctive relief to prevent a breach of the APA.[154]

In support of its materiality scrape argument, CorePower cites our Supreme Court's decision in *AB Stable* and argues that "the representations and warranties in

---

[153] CPY OB at 28–29 (emphasis in original).

[154] *See* APA § 2.4.2(g) (requiring that at each closing, Level 4 must deliver to CorePower the consents and approvals set forth on Schedule 3.4); § 3.4 (containing multiple materiality qualifiers); § 8.11 (stating that the parties have the right to an injunction to prevent breaches or violations of the provisions of the APA).

the APA must be considered to 'act independently' from the post-closing remedy provision embodied in Article VI" because the two provisions contain different materiality standards.[155] CorePower's reliance on *AB Stable*, however, is misplaced. In *AB Stable*, as part of its analysis of an ordinary course covenant and a no-MAE representation, the Supreme Court remarked that "[t]he parties also chose different materiality standards for the two provisions, which shows that the parties intended the provisions to act independently."[156] Here, as explained above, the representations and warranties in the APA act independently from the indemnification provision. At bottom, CorePower's materiality scrape argument appears to be yet another *post hoc* attempt to generate an excuse not to close.[157]

\* \* \* \* \*

For the reasons just explained, I am satisfied the parties intended that the Transaction would close without conditions. Kenny's explanation of the one-way

---

[155] D.I. 200 ("CPY Supplemental Submission").

[156] *AB Stable*, 2021 WL 5832875, at \*13.

[157] Level 4 correctly points out that CorePower first asserted its materiality scrape argument in its opening post-trial brief. Level 4 AB at 33. Because this argument was not asserted by CorePower "in any submissions prior to trial, but rather was made for the first time in its post-trial brief," the argument was waived. *ThoughtWorks, Inc. v. SV Inv. P'rs, LLC*, 902 A.2d 745, 754 (Del. Ch. 2006); *see also Zaman v. Amedeo Hldgs, Inc.*, 2008 WL 2168397, at \*16 (Del. Ch. May 23, 2008) ("Raising this argument in the post-trial briefs is unfair, too late, and does not preserve this argument. It is waived."). I have considered the argument on the merits for the sake of completeness.

gate embedded within the APA was credible and corroborated by other evidence, especially the APA itself. To the extent Level 4 breached the APA before closing, CorePower's remedies included purchase price adjustments and indemnification. They did not include termination.

CorePower maintains that even if the APA, on its face, did not contemplate that the parties could "hit reverse" and back out of the one-way gate, CorePower's election not to close reflects its proper exercise of common law rights. To be sure, the parties did not disclaim common law rights in the APA and Level 4 has offered no principled basis in law or fact to support the notion that either of these contracting parties intended to waive their common law rights with respect to the APA or otherwise. Accordingly, having concluded that the APA requires CorePower to close on the Transaction, I turn next to the extra-contractual, common law justifications proffered by CorePower that might justify its refusal to perform.

**D. No Common Law Bases to Avoid Performance**

CorePower contends that it was entitled to walk away from the Transaction because Level 4 repudiated the contract,[158] the purpose of the APA was frustrated, and Level 4 materially breached the contract.[159] I address each of these proffered

---

[158] CPY OB at 101.

[159] CPY OB at 104–05.

excuses below, but first address a threshold question—at what point should Level 4's conduct and compliance with the APA be measured when determining whether CorePower had an extra-contractual basis to refuse to close?

Level 4 posits that the answer to the timing question is simple—the Court should focus on the state of performance as of the time CorePower declared that it would not close. According to Level 4, in advancing its common law excuses for refusing to perform, CorePower conveniently ignores that it declared it would not close on the Transaction as of March 26, yet it prates on about Level 4's purported breaches of the APA by pointing to events that transpired well after the first closing date came and went without an actual closing.[160]

By CorePower's lights, Level 4 was required to remain in compliance with the APA's representations and warranties throughout the entire Transaction period—meaning through the final closing October 1, 2020—even after CorePower refused to attend the first closing and declared that its "obligations [under the APA were] discharged.[161] In this regard, CorePower points to Section 5 of the APA, which

---

[160] Level 4 AB at 65; Tr. 620:1–7 (DeCoons) (acknowledging that the furloughs at Level 4 took place on April 3, 2020); Tr. 764:6–14 (DeCoons) (acknowledging that the drop in rent expenses occurred after April 1, 2020); Tr. 769:3–9 (DeCoons) (acknowledging that no leases were amended prior to April 1, 2020); Leondakis Dep. at 224:6–10 (acknowledging that as of April 1, 2020, Level 4 maintained the business's capital expenditure and promotional and marketing expenditure practices consistent with past practices).

[161] JX 288 at 1; *see* Defs. and Countercl. Pls. CorePower Yoga, LLC and CorePower Yoga Franchising, LLC's Post-Trial Answering Br. ("CPY AB") (D.I. 191) at 69–78.

43

states that the Ordinary Course Covenant applies "[f]rom the date of [the APA] until the final Closing."[162] But this provision expressly contemplates that the parties will have reached the final closing in the succession of closings contemplated in the APA. They did not. In fact, CorePower saw to it that the parties did not even reach the *first* closing. If CorePower had not materially breached the APA by refusing to close on Tranche 1, then Level 4 would have been required to remain in compliance with the Seller's representations and warranties until the final Closing. But when CorePower communicated to Level 4 that it would not perform under the APA as of March 26,[163] the bargained-for structure of the APA was lost, and when that was lost, so too was CorePower's justification for non-performance based on subsequent actions or omissions by Level 4.[164] When CorePower failed to perform

---

[162] APA § 5.

[163] *E.g.*, Level 4 Yoga, LLC's Post-Trial Opening Br. ("Level 4 OB") (D.I. 183) at 69; Level 4 AB at 42 ("CorePower's litany of rationalizations share only one thing in common: they all post-date CorePower's decision to walk away from the acquisition.").

[164] *See Bardy Diagnostics*, 2021 WL 2886188, at *26 (explaining that party seeking to justify its non-performance must demonstrate that the justification existed "at the time" the party elects not to perform); *Preferred Inv. Servs., Inc. v. T&H Bail Bonds, Inc.*, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013) ("The party first guilty of a material breach of contract cannot complain if the other party subsequently [does not] perform"); 14 Richard A. Lord & Samuel Williston, *Williston on Contracts*, § 43:5 (Nov. 2021 Update) [hereinafter *Williston on Contracts*] (observing that "the party first in default under a bilateral contract cannot recover for the subsequent failure of the other party to perform"). The *Williston* treatise goes on to explain that this rule is especially apt when the first breach is "total," such as an outright refusal to perform, as opposed to "partial." *Id. See also Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *19 (Del. Super. Ct. Aug. 31, 2006) (holding that "a party in material

on April 1, Level 4 correctly perceived that, from that point forward, it was merely a steward of CorePower's assets.[165]

Having determined that I must focus on Level 4's compliance with the APA as of the time CorePower declared it would not close when considering the *bona fides* of CorePower's proffered common law justifications for refusing to perform, I address each justification in turn. As discussed below, none excuse CorePower's non-performance.[166]

## 1. Repudiation

"A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions."[167] "A party may repudiate an obligation through statements when its language, reasonably interpreted, indicates that it will not or cannot perform; alternatively, a party may repudiate through a voluntary and

---

breach"—here CorePower by refusing to close without justification—". . . cannot then complain if the other party fails to perform"). This perspective makes perfect sense in this case. It is impossible to know how Level 4 might have performed under the APA going forward had CorePower honored its obligation to close on April 1 and completed the acquisition of Tranche 1, and Level 4 was not obliged to engage in that conjectural exercise to prove that it is entitled to specific performance.

[165] Level 4 AB at 65. *Cf. McKinley v. Casson*, 80 A.3d 618, 627 (Del. 2013) ("The duty to mitigate damages generally arises after a defendant has breached its duty to a plaintiff.").

[166] I begin the analysis with repudiation since that was the only excuse CorePower communicated to Level 4 in real-time when it decided not to close. JX 288 at 1; Tr. 352:21–355:16 (Otepka).

[167] *PAMI–LEMB I Inc. v. EMB–NHC, L.L.C.*, 857 A.2d 998, 1014 (Del. Ch. 2004).

45

affirmative act rendering performance apparently or actually impossible. In any event, repudiation must be 'positive and unconditional.'"[168] CorePower argues Level 4 repudiated the APA in both word and in deed.[169] In fact, Level 4's supposed repudiation was the rationale proffered by CorePower when it walked away from the deal.[170] The evidence adduced at trial, however, reveals that the proffered "repudiation" was nothing more than CorePower's knee-jerk contrivance to justify its preordained decision to back out of the deal after Level 4 refused to delay the closings.[171]

---

[168] *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009) (quoting *Carteret Bancorp, Inc. v. Home Gp., Inc.*, 1988 WL 3010, at *6 (Del. Ch. Jan. 13, 1988)).

[169] CPY OB at 101.

[170] *E.g.*, JX 288 at 1 (stating on March 26 in an email that CorePower viewed Level 4's "denials and posturing" as "a repudiation of multiple obligations embodied in the Purchase Agreement"); JX 303 (reiterating CorePower's view that Level 4 had "repudiated multiple material obligations embodied in the Asset Purchase Agreement" and thereby "discharge[ed] [CorePower's] obligations thereunder").

[171] I note that CorePower has not invoked "anticipatory repudiation" or "anticipatory breach" as a basis to avoid performance. Its position in March 2020 (and since) was (and has been) that Level 4, then and there, had repudiated the APA. JX 288 at 1. In any event, "to constitute an anticipatory repudiation," the acts or statements of the alleged repudiator must "amount[] to an unequivocal statement . . . that the breaching party would not perform its promise." *AMG Vanadium LLC v. Glob. Advance Metals U.S.A., Inc.*, 2020 WL 1233752, at *7 (Del. Super. Ct. 2020) (cleaned up). "An expression of doubt alone as to one's ability to tender performance on time is not enough to amount to repudiation." *Elliott Assoc., L.P. v. Bio-Response, Inc.*, 1989 WL 55070, at *3 (Del. Ch. May 23, 1989) (citing 4 *Corbin on Contracts* § 974 (1951)). As discussed below, Level 4 made no such unequivocal statement, by word or deed, prior to the time CorePower announced it would not close.

46

### a. No Repudiation by Word

CorePower appears to rely on a single email exchange between Kenny and Wong as evidence that Level 4 expressed its intent to repudiate by word.[172] On March 19, 2020, Kenny wrote that current COVID-19 dynamics "have [Level 4's] operating mode no longer in the ordinary course of business."[173] According to CorePower, this email evidences Level 4's unconditional intent to repudiate the APA since it confirms at the highest level that Level 4 was unable to honor its express commitment to operate in the ordinary course before closing. The persuasive trial evidence, however, revealed CorePower's characterization of Kenny's email to be litigation-driven hyperbole.[174]

Repudiation requires "an outright refusal by a party to perform a contract or its conditions."[175] Aside from the language plucked out by CorePower, Kenny's March 19 email, as a whole, illustrates a commitment from Level 4 to close on the

---

[172] PTO ¶ 59.

[173] JX 265 at 3.

[174] Kenny credibly explained that his email was responding to a previous telephone conversation with Wong during which Wong generally observed that COVID-19 had caused operations at CorePower yoga studios to deviate from the ordinary course. Tr. 72:5–74:14 (Kenny). During that discussion, the parties were speaking in general terms and not specifically referring to the APA's Ordinary Course Covenant or representations that included an ordinary course qualifier. *Id.*

[175] *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *15 (Del. Ch. Sept. 18, 2014).

Transaction.[176]  Moreover, three days later, Kenny's next email affirmed that Level 4 believed the deal was on: "We expect the Buyer to close on the timeline described in the amended Exhibit D to the APA . . . ."[177]  To remove any doubt as to Level 4's intentions and expectations, in his March 22 email, Kenny expressly states, "[w]e want to be clear on our expectations and the terms of the APA.  *We have and will continue to operate the Business in the ordinary course pursuant to the APA . . . .*  More specifically, we have, and we will, preserve the assets associated with the Business."[178]  These are not the statements of a repudiating party.  Wong himself agreed.[179]

### b. No Repudiation by Deed

Nor did Level 4 repudiate the APA by deed.  In its March 26 email to Level 4, CorePower asserts that its "contractual performance has been discharged" because Level 4's "disavowal of [certain] obligations constitutes a repudiation of the

---

[176] *E.g.*, JX 265 at 3 ("Our team would commit the resources pre- and post-closing to ensure success with the transitioning team.").

[177] JX 265 at 1.  At best for CorePower, even if Level 4 repudiated the APA by email on March 19, Kenny's later email expressly revoked that repudiation.  *See Willow-Bay Court*, 2009 WL 458779, at *5 ("Unless the non-repudiating party relies upon the repudiation or notifies the promisor that it considers the repudiation final, the promisor may retract his repudiation, thereby returning the parties to the status quo ante.").

[178] JX 265 at 1 (emphasis added).

[179] Tr. 1079:24–1080:14 (Wong) ("Q. Did this email, in your view, constitute a repudiation of the asset purchase agreement?  A. This email itself?  Q. Yes.  A. No.").

[APA]."[180]    Specifically, CorePower identified the following as evidence of Level 4's supposed repudiation by deed:

> The applicable contractual provisions [Level 4 had allegedly disavowed] include, among others:
>
> - Section 3.6(a), which calls on you to conduct the Business in the Ordinary Course of Business so that the Business does not experience a material loss;
>
> - Section 3.6(e), requiring that the "Seller has not terminated or closed any facility, business or operation"
>
> - Section 3.6(1), requiring that Seller conduct the Business in the Ordinary Course of Business so that the Business does not experience a Material Adverse Effect; and
>
> - Section 5.1, requiring that the Seller conduct the Business "only in the Ordinary Course of Business" detailing multiple components of the business that must be so conducted "consistent with past practice."[181]

CorePower's March 26 email states the basis for its refusal to close. It is appropriate, therefore, to focus on the proffered acts of repudiation outlined in that email when assessing whether Level 4, in fact, had repudiated the APA when CorePower declared it would no longer perform under the APA.[182]

---

[180] JX 288 at 1.

[181] *Id.*

[182] CorePower generated new excuses for refusing to close as this litigation wore on, culminating in its post-trial argument that, by March 26, Level 4 had demonstrated a general "unwillingness to deliver . . . [a] business with particular attributes operating at an established standard" and "[t]he goodwill and intangible assets" of the studios. CPY OB at 102. Of course, CorePower's argument that Level 4 was obliged to deliver assets with

49

Contrary to its repudiation pretext, CorePower's proffered evidence reveals who actually played the repudiation card first and, in so doing, exposes the flaw in its argument. Indeed, all of the actions (or events) CorePower points to in support of its repudiation argument were taken (or occurred) *after* CorePower had definitively declared it would not close on the Transaction.[183] Whether one looks to March 20, when the CorePower board proposed that the parties consider adjourning the closing dates under the APA, or March 26, when CorePower asserted that Level 4 had repudiated, none of the actions CorePower relies on to argue repudiation by deed had occurred by the relevant date (April 1, 2020, the first closing date)—as

---

a particular level of "goodwill" value finds no support in the APA. Instead, the APA simply required Level 4 to deliver the goodwill associated with the Acquired Assets and not to "engage in any activity that might injure the goodwill of the Business." *See* APA Ex. A, § 5.6.2(c). Similarly, CorePower's refrain that Level 4 promised to deliver "well-run" and "well-operated" studios is nowhere supported by the language of the APA or any other credible evidence. *See, e.g.*, Tr. 214:22–215:18 (Kenny) ("Q. Well, look at what your obligations are. Wasn't the deal you were talking about from where – it's fair to say that the transaction you were talking about was the transfer of well-run studios? A. I don't believe that's what the APA says. Q. I'm asking you about – the basic purpose of your transaction was to have you transfer well-operated studios to the buyer? A. I don't agree that that's what the APA says. Q. Let me try again. Isn't it fair to say that the essence of the transaction, because you talked all about lots of different pieces of paper – the essence of this transaction was for you to transfer well-operated studios to CorePower? A. I don't know of a defined term in the APA or the call option agreement defining "well-operated studios." So I don't know how to live up to that statement."). In fact, the APA makes clear that Level 4 was to deliver its yoga studios "as is" and "where is." APA § 3.21.

[183] Level 4's Answering Post-Trial Br. ("Level 4 AB") (D.I. 192) at 8. While the studios were closed prior to April 1, CorePower points to the "prolonged shutdown of all Studios" as evidence of repudiation. CPY OB at 98. The studios were not shut down for a prolonged period of time prior to April 1; in fact, at that time, as noted, the closures were expected to be very temporary.

discussed below, Level 4 had not restructured any leases, laid-off employees or cut its marketing expenditures.[184]

### i. Material Loss—Section 3.6(a)

CorePower's March 26 email maintained that Level 4 repudiated the APA because Level 4's business as a whole had experienced financial losses greater than $50,000.[185] Level 4's expert, Jeffrey J. Mordaunt, disagreed with this interpretation, stating in his report that "[CorePower's] interpretation of this provision is inconsistent with my experience involving similar provisions in acquisition agreements."[186] Specifically, Mordaunt explained that, based on his experience, representations like those in Section 3.6(a) are "made to ensure that there is no physical damage to or dispossession of the assets of the business. The purpose of

---

[184] JX 1020 (lease amendment summary); Tr. 768:19-769:9 (DeCoons) (recognizing that there were no lease amendments dated prior to April 1, 2020); Tr. 1313:10–15 (Leondakis) (acknowledging that Level 4 conducted its layoffs on April 3, 2020, which was after CorePower had conducted its layoffs); Leondakis Dep. at 224:6–10 ("Q. Did Level 4 maintain the business's capital expenditure and promotional and marketing expenditure practices consistent with best practice as of the date of closing? A. I believe so.").

[185] JX 288 at 1; CPY OB at 65 n.39 (stating that Section 3.6(a) barred Level 4 from suffering a material loss in excess of $50,000); CPY AB at 18–20; APA § 3.6(a) (Level 4 representing that "[t]here has been no material loss . . . affecting the Business or any Acquired Asset with a value in excess of $50,000").

[186] JX 644 ("Mordaunt's Report") ¶ 107.

these types of representations is for the seller to provide assets in a similar condition compared to when the agreement was entered."[187]

In my view, neither party has proffered a reasonable construction of the contractual provision at issue. Section 3.6(a) represents that no "material loss" (undefined) had "affect[ed]" the Business *or* an "Acquired Asset with a value in excess of $50,000."[188] As the language makes clear, $50,000 describes the value of the Acquired Assets subject to the representation, not that the value of the loss to such Acquired Assets. And CorePower presented no evidence of a "material loss" as of March 26. That being said, even under CorePower's proffered interpretation, the evidence supports a finding that Level 4 "had not experienced a financial loss over $50,000 by the time TSG and the Defendants [walked away from] the Transaction on March 20, 2020."[189] As Mordaunt credibly testified, as of the date CorePower terminated the Transaction, "Level 4's EBITDA was $(28,669), which does not meet the threshold of a $50,000 loss."[190]

---

[187] Mordaunt's Report ¶ 108.

[188] APA § 3.6(a).

[189] Mordaunt's Report ¶ 112.

[190] Mordaunt's Report ¶ 112(a).

### ii. Studio Closures—Section 3.6(e)

CorePower also asserted that Level 4 had repudiated the APA by breaching Section 3.6(e).[191] There, Level 4 represented that it had "not terminated or closed any facility, business or operation."[192] On March 15, 2020, CorePower announced on its website that all CorePower studios, including Level 4's, would be closed in response to COVID-19.[193] As a result, Level 4 was required to close its studios and did so the following day.[194] Not long after, when government-mandated closures went into effect, like all other CorePower yoga studios, Level 4 was obligated under the Franchise Agreement to close its studios to comply with those mandates.[195] At the time CorePower walked away from the Transaction, the parties operated under the assumption that these closures would be temporary.[196]

---

[191] JX 288 at 1.

[192] APA § 3.6(e).

[193] PTO § III(D)(55).

[194] PTO § III(D)(56).

[195] Pessin Dep. at 42:9–24 (acknowledging that the franchise agreements required CorePower franchisees to operate their studios in full compliance with all applicable laws, ordinances and regulations, and if a government order required a CorePower franchisee, like Level 4, temporarily to close a CorePower-branded yoga studio, then CorePower would expect the franchisee to do so).

[196] Tr. 587:10–588:6 (Mordaunt) (commenting that "as of March 16th of 2020, the CDC and the White House had only suggested temporary closures for two weeks. And then states that issued closure orders within the second half of March, all of them expected the closures to last through the end of March or, worst case, mid-April of 2020, that on April 1, 2020"); Pessin Dep. at 141:11–19 ("Q. Is it fair to say that on March 2020 – March 20,

When determining whether these temporary closures evidenced Level 4's "outright refusal . . . to perform the [APA],"[197] I must focus on whether Level 4 signaled "that it [would] not or [could not] perform" the APA when it complied with CorePower's direction that it temporarily shutter its CorePower-branded yoga studios.[198] No such signal was delivered. First, repudiation requires a "voluntary act."[199] Level 4 did not voluntarily close its yoga studios; it was required to close them, first at the direction of its franchisor and then by government mandates.[200] Moreover, at most, CorePower expected the closures to last for six

2020, that CorePower management's best estimate about the anticipated duration of the Coronavirus closures was six weeks? A. Yeah, I guess. I guess. There's probably a deck that shows two, and there's probably one that shows eight. So yes, I guess. At that moment in time, maybe it was six weeks we were looking at.").

[197] *PAMI–LEMB I Inc.*, 857 A.2d at 1014.

[198] *W. Willow-Bay Court, LLC*, 2009 WL 458779, at *5.

[199] *Id.*

[200] *See* JX 230; JX 261; Tr. 336:8–23, 343:9–12 (Otepka); Tr. 120:24–122:11 (Kenny); JX 302; JX 306–07; JX 320; JX 340; JX 343;JX 345–46; JX 349; JX 363; JX 367; JX 375; JX 391; JX 393; JX 396; JX 412–13; JX 432; JX 618. To be sure, CorePower notified Level 4's members of the closures directly and then shut-down Level 4's yoga class reservation system. *See* Tr. 342:18–343:12 (Otepka). Once the government stepped in, the APA and the Franchise Agreement both required Level 4 to comply with the mandated closures lest it breach its contractual obligations. *See* APA § 3.11.1; Franchise Agreement § 8.7; Tr. 1069:23–1070:4 (Wong).

weeks.[201]  Such temporary closures hardly evidence outright refusal and inability to perform.[202]

### iii.  Material Adverse Effect—Section 3.6(l)

CorePower next asserted that a repudiation had occurred because the effects of the COVID-19 pandemic caused Level 4 to breach its representation that no MAE had occurred (the "No-MAE Representation").[203]  To determine whether an MAE occurred, I start with the APA's definition of the term and then consider "whether there has been an adverse change in the target's business that is consequential to the company's long-term earnings power over a commercially reasonable period, which one would expect to be measured in years rather than months."[204]  With that said, I am mindful that "[t]here is no 'bright-line test' for evaluating whether an event has caused a material adverse effect."

Under the APA, MAE is defined as "a material and adverse effect on the business, assets, liabilities, financial condition, property or results of operations of

---

[201] JX 257 at 3 (showing that as of March 20, 2020, CorePower thought the studios would be closed for no longer than six weeks).

[202] *PAMI–LEMB I Inc.*, 857 A.2d at 1014.

[203] JX 288 at 1; CPY AB at 75.  *See* APA §3.6(l) (representing that "[n]o event or circumstance has occurred which constitutes a Material Adverse Effect").

[204] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008).

the Seller, taken as a whole."[205]  This definition, unlike other MAE definitions, contains no exceptions.[206]  This would signal that the seller is assuming most of the risk of an MAE.[207]

On the other hand, certain aspects of the APA's MAE definition favor the seller.  Specifically, the definition does not contemplate that the parties will undertake a forward-looking analysis when assessing if an MAE has occurred.[208]  This court has observed that, "[t]he forward-looking nature of the [MAE] also flows from the language of a standard MAE provision, which asks whether an effect 'has had or *is reasonably expected to have*' a material adverse effect."[209]  The phrase

---

[205] APA Ex. A at 58.

[206] *AB Stable*, 2020 WL 7024929, at \*48 (commenting that the contractual definition of material adverse effect at issue in that case "follows standard form, consisting of an initial definition followed by a series of exceptions"); *see also* Matthew Jennejohn et al., *COVID-19 as a Force Majeure in Corporate Transactions* (Columbia L. and Econ.  Working Paper No.  625,  BYU  L.  Research  Paper  No.  21-10,  2020)  (available  at https://ssrn.com/abstract=3577701) (finding that, as of March 26, 2020, nearly 24% of pending deals explicitly carve out pandemic-like contingencies and 42% implicitly carve out such events through general force-majeure provisions).

[207] Unlike the "overwhelming majority of contemporary deals," the MAE definition in the APA "does not contain an exclusion for events that have a disproportionate effect on [Level 4 or its business].  A disproportionate-effect exclusion favors the seller by shifting risk back to the buyer." *AB Stable*, 2020 WL 7024929, at \*61.  Thus, "the omission of a disproportionality exclusion signals a seller-friendly MAE clause." *Id.*

[208] APA § 3.6(l) ("No event or circumstance *has occurred* which constitutes a Material Adverse Effect.") (emphasis supplied).

[209] *AB Stable*, 2020 WL 7024929 at \*61 (emphasis supplied) (citing *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at \*34 (Del. Ch. Apr. 29, 2005)).

56

"expected to have" would allow a buyer to declare an MAE based on reasonably anticipated events, even if those events had not yet occurred. As noted, this forward-looking language is absent from the MAE definition at issue here.[210]

When determining whether an MAE has occurred, the court must find that "the magnitude of the downward deviation in the affected company's performance [was] material,"[211] and that the effect will "substantially threaten the overall earnings potential of the target in a durationally-significant manner."[212] The durational significance is particularly important here because CorePower was seeking to acquire Level 4 as part of a long-term strategy.[213] "To such an acquiror, the important thing is whether the company has suffered a Material Adverse Effect in its business or results of operations that is consequential to the company's earnings

---

[210] With this said, even in the absence of forward-looking language in the definition, "[t]he concept of a material adverse effect is inherently forward looking, and necessarily so because of the 'basic proposition of corporate finance that the value of a company is determined by the present value of its future cash flows." *AB Stable*, 2020 WL 7024929, at *61 (citing *Hexion*, 965 A.2d at 743 n.75).

[211] *Akorn*, 2018 WL 4719347, at *52.

[212] *In re IBP, Inc. S'holders Litig*., 789 A.2d 14, 68 (Del. Ch. 2001), *as corrected* (Del. Ch. June 18, 2001).

[213] Tr. 961:6–12 (Wong) (When asked what TSG's investment horizon was for CorePower Yoga, Wong remarked that TSG "underwrite[s] to a five-year investment horizon."); Tr. 1034: 6–13 (Wong) ("Q. And you were the long-term owner; right? A. Potentially, yes, we were scheduled to be the long-term owner, yes. Q. Well, you had signed a contract that made you the long-term owner, hadn't you? A. Yes, but hadn't closed yet, so we weren't long-term owner yet.").

power over a commercially reasonable period, which one would think would be measured in years rather than months."[214]

CorePower, Level 4 and their respective experts offered dueling perspectives regarding whether the COVID-19 pandemic significantly impacted the value of Level 4's business.[215] I need not decide who has the better of the evidence on this issue, however, because even if the effect ultimately was significant, at the time CorePower purported to invoke the No-MAE Representation, there was absolutely no basis for CorePower to conclude that the business effects of COVID-19 were then, or later would be, significant.[216]

An MAE's durational significance must be measured from the perspective of a "reasonable acquiror."[217] "[O]ur courts have stopped short of prescribing specific time periods when assessing 'durational significance,' and for good reason. . . .

---

[214] *In re IBP*, 789 A.2d at 67.

[215] *See generally* Mordaunt's Report; JX 673.

[216] *See Bardy Diagnostics*, 2021 WL 2886188, at *26 (analyzing whether the effect on plaintiff's earning potential, "*at the time [the defendant] invoked the MAE clause*, would reasonably be expected to constitute an MAE") (emphasis added) (internal quotation marks omitted); *Channel Medsystems, Inc. v. Boston Sci. Corp.*, 2019 WL 6896462, at *28 (Del. Ch. Dec. 18, 2019) (holding that the party asserting the occurrence of a material adverse effect "has the burden to prove that, *as of the termination date*, the inaccurate representations in the [a]greement would reasonably be expected to have a Material Adverse Effect on [the allegedly breaching party] around the time the parties[ ] expected the merger to close.") (emphasis added).

[217] *In re IBP*, 789 A.2d at 68 (emphasis added).

[T]he determination of what is a 'commercially reasonable period' is contextual and necessarily fact intensive"; it will "turn on the target company's unique characteristics and the broader business dynamics in which the target operates."[218]

As in *Snow Phipps*, where Chancellor McCormick observed that "[t]his court's decisions in *IBP* and *Akorn* provide helpful benchmarks confirming that it was not reasonable to expect that [COVID-19's effects on the target] would mature into a material adverse effect," I am satisfied those benchmarks lead to the same conclusion here.[219]  Chancellor McCormick aptly summarized those cases as follows:

> In *IBP*, the seller experienced a 64% decrease in year-over-year first quarter earnings due to severe winter weather that adversely affected livestock supplies.  By the termination date, however, the seller had two weeks of strong earnings that signaled a strong quarter ahead.  Further, the analyst community was predicting that IBP would return to historically healthy earnings the following year.  The court concluded that the business appears to be in sound enough shape to deliver results of operations in line with the company's recent historical performance.  The court thus held that a material adverse effect was not reasonably expected.
>
> In *Akorn* . . . , the seller's EBITDA had grown each year from 2012 through 2016, but it fell by 55% after the merger agreement was signed in 2017.  The buyer sent the seller a notice of termination in early 2018.  According to the seller's management, the downturn had already persisted for a year and showed no sign of abating.  Analyst estimates

---

[218] *Bardy Diagnostics*, 2021 WL 2886188, at *27.

[219] *Snow Phipps*, 2021 WL 1714202, at *33 (finding that no material adverse effect had occurred).

for the seller's 2018, 2019, and 2020 EBITDA were lower than those at the time of signing by 62.6%, 63.9%, and 66.9%, respectively. The court found that the company's poor performance was the result of unexpected new market entrants, which lead to price erosion. The court held that this *sudden and sustained drop* in Akorn's business performance was reasonably expected to constitute a material adverse effect.

The *Akorn* court also addressed whether the seller's regulatory issues, which were not disclosed to the buyer when the merger agreement was signed, constituted a material adverse effect. After weighing the credibility of the experts and conducting its own cross-check, the court concluded that the regulatory issues represented a 21% decrease in the equity value of the seller. The court held that this decrease was reasonably expected to constitute a material adverse effect.[220]

With this backdrop in mind, it is rather easy to conclude that the evidence of COVID-19's effects on Level 4's business as of the time CorePower declared the occurrence of an MAE falls well short of reaching the MAE mark. It is not surprising, then, that CorePower's expert witness, Robert Reilly, testified that he had no opinion on whether Level 4 had experienced an MAE prior to April 1, 2020.[221] And CorePower's other witnesses admitted they performed no analysis of whether Level 4 experienced an MAE in March 2020 when CorePower decided not to close.[222]

---

[220] *Snow Phipps*, 2021 WL 1714202, at *33–34 (emphasis in original) (internal quotation marks, footnotes and alterations omitted).

[221] Tr. 1213:23–1214:1 (Reilly).

[222] Tr. 1297:24–1298:5, 1301:12–1302:15 (Leondakis); Trial Tr. 1064:7–17 (Wong).

CorePower's own actions and statements indicate that, as of the date of the first closing, it did not believe the COVID-19 pandemic would persist for any durationally significant period. As a condition to drawing on its delayed-draw term loan, CorePower certified to its lenders that, as of the proposed borrowing date (March 19, 2020), "there ha[d] been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect."[223] Not surprisingly, CorePower presented no credible evidence to explain how the COVID-19 pandemic purportedly disrupted Level 4's business to a degree that would qualify as an MAE while CorePower's business was able to rise above the MAE mark. To the contrary, I am satisfied that when CorePower certified to its lender that it had not suffered an MAE as of March 19, 2020, it had no reason to believe then, or a week later, that Level 4 was situated any differently.[224]

On March 20, 2021, during a presentation to its board, CorePower's management team forecasted that CorePower's COVID-related studio closures

---

[223] *See* JX 120 § 5.04(c); JX 224; Pessin Dep. at 165:5–166:11; Tr. 1093:17–1094:2 (Wong); Tr. 1303:21–1306:16 (Leondakis).

[224] This evidence is especially convincing given that the MAE representation made by CorePower under its credit agreement contained the forward-looking phrase—"has had or would be reasonably be expected to have"—that the parties chose to omit from the APA's MAE definition. *See* JX 120 § 4.01(i).

61

would last six weeks.[225]  This is hardly durationally significant under any measure.[226]

And yet, at this same March 20 board meeting, CorePower decided it would not close on the Transaction.[227]  I need not decide whether CorePower's decision was motivated by a perceived need to preserve its liquidity, as argued by Level 4,[228] or by a preference to focus more acutely on the evolving COVID-19 situation without distraction.  In either scenario, it appears that CorePower anticipated only "[a] short-term hiccup in earnings," which our court has determined "should not suffice" for an MAE.[229]

### iv.  Ordinary Course of Business—Section 5.1

CorePower's final proffered basis to rationalize its repudiation claim was that Level 4 had breached the Ordinary Course Covenant and the representations that

---

[225] JX 257 at 3.

[226] *Akorn*, 2018 WL 4719347, at *53 (citing to *Raskin v. Birmingham Steel Corp.*, 1990 WL 193326, at *5 (Del. Ch. Dec. 4, 1990) and *Allegheny Energy v. DQE, Inc.*, 74 F. Supp. 2d 482, 518 (W.D. Pa. 1999)) ("Chancellor Allen posited that a decline in earnings of 50% over two consecutive quarters would likely be an MAE.  Courts in other jurisdictions have reached similar conclusions.").

[227] Tr. 1293:13–1294:21 (Leondakis).

[228] *See, e.g.*, Level 4 AB at 4–5 ("The repudiation argument was merely the first of a long series of CorePower's excuses for its financial decision at its March 20, 2020 board meeting to preserve cash during the pandemic regardless of its contractual obligations to Level 4 and heedless of the cost to Level 4.").

[229] *Akorn*, 2018 WL 4719347, at *53 (quoting *In re IBP*, 789 A.2d at 68).

were subject to an ordinary course condition.[230] CorePower continued to press that claim at trial and it bore the burden to prove it.[231] Here again, its trial proofs fell short.[232]

This court has interpreted "the contractual term ordinary course to mean the normal and ordinary routine of conducting business."[233] As explained in *AB Stable*:

> Generally speaking, there are two principal sources of evidence that the court can examine to establish what constitutes the ordinary course of business. First, the court can look to how the company has operated in the past, both generally and under similar circumstances. Second, the court can look to how comparable companies are operating or have operated, both generally and under similar circumstances.[234]

As is the case here, however, when "an ordinary course provision includes the phrase 'consistent with past practice' or a similar phrase, the court evaluates the second

---

[230] JX 288 at 1.

[231] *See AB Stable*, 2020 WL 7024929, at *51 ("Buyer contends that Seller failed to fulfill the Ordinary Course Covenant. Consistent with prior precedent, Buyer bore the burden of proving that Seller breached this covenant and caused the Covenant Compliance Condition to fail.").

[232] I confess that CorePower's position that it should be excused from performing the APA, in part, because Level 4 followed CorePower's instruction temporarily to close its studios—an instruction CorePower itself executed when it directly contacted Level 4 members to advise them that Level 4's studios were closed and then manually cancelled all Level 4 yoga classes—was received by the Court with the sour taste of hypocrisy.

[233] *See AB Stable*, 2020 WL 7024929, at *68 (cleaned up); *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, at *17 (Del. Ch. Oct. 31, 2014) (quoting *Ivize of Milwaukee, LLC v. Complex Litig. Supp., LLC*, 2009 WL 1111179, at *9 (Del. Ch. Apr. 27, 2009)).

[234] *AB Stable*, 2020 WL 7024929, at *70.

category only."[235]  Thus, when determining whether Level 4 failed to operate in the Ordinary Course of Business, I train my sight on how Level 4 itself historically has operated, both generally and under similar circumstances.[236]

As explained above, Level 4's operation of its CorePower-branded studios was almost entirely dictated by CorePower's System Standards.  And all relevant evidence presented at trial revealed that Level 4 historically and faithfully adhered to those standards.[237]  If CorePower took an action with respect to its corporate-

---

[235] *Snow Phipps*, 2021 WL 1714202, at *38 (citing *AB Stable*, 2020 WL 7024929, at *71). To reiterate, the APA defines "Ordinary Course of Business" as "an action taken by any Person in the ordinary course of such Person's business which is consistent with the past customs and practices *of such Person* (including past practice with respect to quantity, amount, magnitude and frequency and standard employment policies and past practices with respect to management of cash and working capital) which is taken in the ordinary course of the normal day-to-day operations of such Person."  APA Ex. A at 59 (emphasis supplied).

[236] I acknowledge CorePower's argument that Level 4 is asking "the Court [to] rewrite the absolute and unqualified language of the provision—adding a scienter requirement or efforts qualifier that would limit the application of that provision to Plaintiff's volitional conduct."  CPY Supplemental Submission at 3.  I disagree.  Level 4 did not argue, and the evidence did not prove, that Level 4 did its best to operate in the ordinary course but fell short.  Rather, Level 4 has maintained all along, and the preponderance of the evidence proves, that Level 4 was successful in its efforts to operate its yoga studios in the ordinary course during the post-signing/pre-closing period.

[237] Tr. 23:15–25:14 (Kenny) (summarizing instances when Level 4 complied with the System Standards despite disagreeing with the direction); Tr. 300:11–17 (Otepka) ("Q. Did Level 4 have a practice of complying with its franchise agreements?  A. Yes, we did. Q. Can you recall a time that Level 4 ever received a notice that it was not in compliance with its franchise agreement?  A. No, we never received that notice.").  I acknowledge that the evidence reveals that Level 4 occasionally deviated from System Standards. Tr. 1272:13–1273:20 (Leondakis) (discussing how, unlike CorePower, Level 4 did not mandate the wearing of masks); Tr. 1270:5–1272:8; 1333:23–1335:13 (Leondakis) (describing how, in November 2020, CorePower's Chicago studios remained closed due to

operated studios that affected its mode of operation, Level 4 was required under the Franchise Agreement to follow suit.[238] If CorePower gave a direction to its franchisees, such as to close yoga studios temporarily, Level 4 was obligated to

_____

health regulations, but because Level 4 interpreted the same regulation differently, it elected to open its Chicago studios). These deviations were almost always cured and they were uncommon. Tr. 1333:13–22 (Leondakis) ("But you've never gone to Level 4 after you became aware of it and said, you're doing something inconsistent with your franchise obligations, have you? A. No. Q. And you acknowledged at your deposition that if CorePower believed that Level 4 was in violation of its franchise agreements, CorePower would have given notice to Level 4. Right? A. Yes.") Tr. 1335:4–21 (Leondakis) (discussing when Level 4 failed to follow system standards regarding studio closures and masking protocols and CorePower's response). More to the point, the occasional deviations do not alter my factual finding that Level 4's custom and practice was to comply with System Standards and other directions it received from CorePower as franchisor.

[238] Tr. 301:23-302:18 (Otepka) (Section 8.1 of the Franchise Agreement states, "You acknowledge and agree that operating and maintaining your Studio according to System Standards is essential to preserve the goodwill of the Marks and all Studios." When asked how Level 4 followed this guidance in the ordinary course of its business, Otepka credibly testified: "So as CEO, it's my responsibility for running the studios according to CorePower Yoga's standards. And as it says here, these – following their standards, following their guidance, _following their lead to follow these standards_, it is important for maintaining brand consistency. And it's 'essential to preserve the goodwill of the Marks' means, you know, it's critical that we maintain brand consistency by operating under these standards.") (emphasis supplied). At trial, Wong testified that, in some respects, CorePower deviated from its own historic practices and never advised Level 4 that it was required to "follow these new standards." Tr. 1054:5–1055:5 (Wong). I found the testimony confusing and ultimately unpersuasive. No evidence was presented that would indicate Level 4 was not required under the Franchise Agreement to operate in accordance with the System Standards. And the System Standards include any direction provided by CorePower to Level 4 via written or oral communications. Franchise Agreement § 4.3; _see also_ Tr. 1050:9–1051:23 (Wong).

comply.[239]  This is precisely why Level 4 took the actions that CorePower now asserts violated the Ordinary Course Covenant.

As noted, CorePower directed that its franchisees close their studios, and Level 4, consistent with past practice, obliged.  CorePower started implementing employee layoffs soon after, on March 30, 2020.[240]  Ultimately, CorePower laid off roughly 98% of its employees and made its franchisees, like Level 4, aware of those layoffs as they happened.[241]  CorePower also provided its franchisees with a script the franchisee could use when conducting its own layoffs.[242]  A few days later, on April 3, 2020, Level 4 followed CorePower's lead and furloughed the majority of its staff.[243]  Again, while the layoffs may have been extraordinary, the practice of

---

[239] Tr. 366:14–367:3 (Otepka) ("Q. Were Level 4's temporary closures consistent with its past custom and practice?  A. Absolutely.  Q. And why?  A. Well, as I've been mentioning, we've had a longstanding history of following the franchise agreement.  That's our Bible.  And in that, we followed, you know, the health and safety, as I described.  We also had a history of following what CorePower was doing.  And, again, CorePower was – their studio closed ours, and we were closing according to what they were doing, as we always would have.") Tr. 1037:13–22; 1056:2–1057:13 (Wong) (confirming that CorePower notified its members that all CorePower studios would be closed).

[240] JX 1010; Tr. 1311:4–7 (Leondakis).  Of course, by March 30, CorePower had already advised Level 4 that CorePower would not perform under the APA.  *See* JX 288 at 1.

[241] Tr. 1312:1–24 (Leondakis).

[242] Tr. 1313:1–5 (Leondakis).

[243] Tr. 1313:10–15 (Leondakis).

following the direction of the franchisor was entirely ordinary and consistent with past practice.[244]

In its post-trial brief, CorePower argued there were differences between Level 4's operations pre- and post-pandemic in other respects (even after studios reopened), including "revenue, staffing, class size, lockers, hands-on training, teacher training, bring your own stuff, safety protocols[,] etc."[245] CorePower, once again, fails to recognize that these actions were consistent with Level 4's ordinary course because, in each respect, Level 4 followed the example set by its franchisor.[246] With respect to changes in revenue, the APA contains no seller's representation that revenue was not affected pre-closing, and CorePower has offered no other basis to lash a vague assertion that revenue was "affected" to the APA's Ordinary Course Covenant.[247]

---

[244] The lease amendments and PPP loans followed and, again, were necessary responses to Level 4's compliance with direction from the mothership.

[245] CPY OB at 56.

[246] Tr. 1329:15–1331:4 (Leondakis) (acknowledging that when CorePower reopened its studios it implemented a series of COVID-19 protocols, including reduced studio capacities, social distancing, increased cleaning protocols, masking, suspending towel and mat rentals, prohibiting hands-on teacher assists, and reducing staff). Tr. 1329:3–5 (Leondakis) (acknowledging that CorePower closed off access to all of the locker rooms and showers).

[247] In *Hexion*, this court rejected Hexion's interpretation of an MAE provision because "[t]o allow the MAE analysis to hinge on Huntsman's failure to hit its forecast targets during the period leading up to closing would eviscerate, if not render altogether void, the meaning of section 5.11(b)." *Hexion Specialty Chems., Inc.*, 965 A.2d at 741. Specifically, Section 5.11(b) "explicitly disclaim[ed] any representation or warranty by Huntsman with

At the time CorePower claimed Level 4 had repudiated the APA by failing to operate in the ordinary course, the only steps Level 4 had implemented in response to COVID-19 were to close its yoga studios at CorePower's direction and to cancel yoga classes, again at CorePower's direction. These steps reflected Level 4's compliance with its obligations as franchisee, not deviations from past practice. There was no repudiation of the APA by virtue of a breach of the Ordinary Course Covenant.

## 2. Frustration of Purpose

While not proffered as a basis to excuse non-performance when CorePower declared it would not close the Transaction, CorePower now argues that its performance under the APA was excused because the purpose of the APA was frustrated by Level 4's post-signing conduct.[248] The frustration of purpose doctrine applies when: "(1) there is substantial frustration of the principal purpose of the contract; (2) the parties assumed that the frustrating event would not occur; and

---

respect to 'any projections, forecasts or other estimates, plans or budgets of future revenues, expenses or expenditures, future results of operations, future cash flows or future financial condition of [Huntsman] or any of its Subsidiaries heretofore or hereafter delivered to or made available to [Hexion or its affiliates].'" *Id.* at 740–41 (cleaned up). The APA contains a similar provision at Section 3.21, which explicitly disclaims any representations and warranties "regarding the probable success or future profitability of the Business." APA § 3.21.

[248] CPY OB at 102.

(3) the [d]efendant is not at fault."[249]  While frustration of purpose can excuse a party's performance under a contract, it "is very difficult to invoke," and for good reason.[250]  Delaware courts understandably are "extremely reluctant to allow parties to disavow obligations that they have agreed to."[251]

According to CorePower, the "fundamental purpose of the APA was to facilitate Defendants' purchase of an entire business consisting of well-operating Yoga Studios."[252]  The argument that Level 4 "substantially frustrated" this purpose presupposes that Level 4 either repudiated or materially breached the APA.[253]  As discussed above and below, Level 4 did not repudiate or materially breach the APA and, therefore, there was no frustration of purpose.  Moreover, to reiterate, the yoga studio closures, which are at the heart of CorePower's frustration of purpose argument, occurred in direct response to CorePower's own direction.  That is not a

---

[249] *CRS Proppants LLC v. Preferred Resin Hldg. Co., LLC*, 2016 WL 6094167, at *7 (Del. Super. Sept. 27, 2016) (finding that defendant's performance was not excused by a frustration-of-purpose defense).

[250] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 2005 WL 5757653, at *6 (Del. Ch. July 27, 2005).

[251] *Id.*

[252] CPY OB at 5.

[253] *CRS Proppants LLC*, 2016 WL 6094167, at *7.

circumstance where the frustration of purpose doctrine will excuse non-performance.[254]

### 3. Material Breach

As with frustration of purpose, CorePower's material breach arguments emerged in the midst of litigation.[255] Not surprisingly, the scope of the alleged material breaches has expanded rather substantially from the bases CorePower proffered to support its sweeping declaration in real-time that Level 4 had repudiated the APA in March 2020. Indeed, it very much appears to this factfinder that CorePower simply went down the list of the seller's Section 3.6 representations and checked any that might arguably be implicated by events that transpired *after* it declared it would not perform. As discussed below, CorePower has a substantial hurdle to clear here—the APA does not allow it to walk from closing based on a simple breach of contract. To justify its non-performance, CorePower was obliged

---

[254] *See Id.; Martin v. Star Publ'g Co.*, 126 A.2d 238, 242–43 (Del. 1956) ("In all the cases holding that the promisor was discharged from duty by impossibility of performance or frustration of purpose, it has been assumed that the promisor was not himself the responsible cause of the impossibility or frustration.") (quoting 6 *Corbin on Contracts* § 1329).

[255] In fact, Level 4 correctly points out that CorePower's assertions that Level 4 breached Section 3.6(i) of the APA by amending its leases and Section 3.7 of the APA by accepting a Paycheck Protection Program ("PPP") loan did not appear in CorePower's operative counterclaim and, instead, first made an appearance in pre-trial briefing. Here again, this late appearance is tantamount to waiver. *See Snow Phipps*, 2021 WL 1714202, at *44 (rejecting an argument raised for the first time in pre-trial briefing). Once again, however, for the sake of completeness, I address the claims below.

to demonstrate a *material* breach of the APA. It did not come close to clearing that imposing bullfinch.

"Delaware law firmly supports the principle that a party to a contract is excused from performance if the other party is in material breach of his contractual obligations."[256] "The converse of this principle is that a slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract."[257] As a matter of common law, "[a] breach is material if it goes to the root or essence of the agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."[258] "Under this doctrine, whether a breach is material 'is determined by weighing the consequences in the

---

[256] *Brasby v. Morris*, 2007 WL 949485, at *4 (Del. Super. Ct. March 29, 2007) (cleaned up). *See also Segovia v. Equities First Hldgs., LLC*, 2008 WL 2251218, at *23 (Del. Super. Ct. May 30, 2008) ("The concept of cancelling contracts upon a material breach is well-settled in Delaware law: [']'[A] party may terminate or rescind a contract because of substantial nonperformance or breach by the other party.") (citations omitted).

[257] *Brasby*, 2007 WL 949485, at *4 (citation omitted); *see also Segovia, LLC*, 2008 WL 2251218, at *23 ("Not all breaches will authorize the other party to abandon or refuse further performance. To justify termination it is necessary that the failure of performance on the part of the other go to the substance of the contract.[']").

[258] *Mrs. Fields Brand, Inc. v. Interbake Foods*, LLC, 2017 WL 2729860, at *28 (Del. Ch. June 26, 2017).

light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'"[259]

Section 241 of the Restatement (Second) of Contracts provides five factors that are useful when determining whether a breach is material. They are:

> (i) the extent to which the injured party will be deprived of the benefit which he reasonably expected, (ii) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived, (iii) the extent to which the party failing to perform or to offer to perform will suffer forfeiture, (iv) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances, and (v) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[260]

Unfortunately, CorePower did not focus on these or any other factors to support its argument that Level 4's material breach justified its own non-performance. The failure to do so is not surprising given that the evidence of material breach is sorely lacking here.[261] As discussed below, none of the alleged breaches of the APA were consequential enough to excuse CorePower's performance.

---

[259] *AB Stable VIII LLC*, 2020 WL 7024929, at *98.

[260] *Id.* (quoting Restatement (Second) of Contracts § 241 (1981) (internal quotations omitted)).

[261] *See* 14 *Williston on Contracts*, § 43:6 (noting that "whether a nonperformance is sufficiently material is ordinarily an issue of fact," and that "[i]t is ultimately a question of degree, which, it has been said, should be decided based on the inherent justice of the matter"); *Commonwealth Const. Co.*, 2006 WL 2567916, at *19 ("Whether a breach is material is a fact-sensitive analysis."); 17A Am. Jur. 2d *Contracts* § 670 (Feb. 2022

### a. Material Loss—Section 3.6(a)

For the same reasons Level 4 did not repudiate the APA by breaching Section 3.6(a), it did not materially breach that section either. CorePower presented no credible evidence that Level 4 had sustained a "material loss . . . affecting the Business or any Acquired Asset with a value in excess of $50,000" at the time CorePower declared it would not close the Transaction.[262] And, to the extent CorePower is correct that $50,000 sets the mark for "material loss," the evidence reveals that Level 4 did not reach that mark as of March 26, 2020.[263] There was no material breach of Section 3.6(a) as of the date CorePower announced it would not close.

### b. Staff Layoffs—Section 3.6(c)

At Section 3.6(c), Level 4 represented that it had not "amended or terminated any agreement or contract providing for the employment or engagement of any

---

Update) ("Where a breach causes no damages or prejudice to the other party, it may be deemed not to be material.").

[262] APA § 3.6(a).

[263] Given the anticipated short-term consequences of COVID-19 at the time CorePower purportedly was assessing Level 4's compliance with Section 3.6, I cannot conclude that CorePower would have been "deprived" of the benefit of the bargain it reasonably expected even if Level 4's losses had exceeded the $50,000 threshold, or that CorePower could not have been "adequately compensated" for such losses post-closing under the APA's price adjustment or indemnification regimes. *See* Restatement (Second) of Contracts § 241 (1981).

Person on a full time or time . . . basis . . . other than in the Ordinary Course of Business."[264] Even assuming Level 4 had initiated staff layoffs prior to CorePower's declaration that it would not close, an assumption not supported by the evidence, CorePower did not prove that the temporary staff layoffs, made in response to CorePower's direction that Level 4 close its studios, "touche[d] the fundamental purpose of the contract and defeat[ed] the object of the parties in entering into the contract,"[265] or that they departed from Level 4's ordinary past practice of following its franchisor's directions. To the contrary, the layoffs were quintessentially temporary, as CorePower itself recognized.[266] That Level 4 followed CorePower's lead by laying off employees for the short duration the closures were expected to last did not provide a basis for CorePower to refuse to close.

### c. Studio Closures—Section 3.6(e)

The same is true with respect to studio closures. Level 4 *temporarily* closed its yoga studios when CorePower announced to Level 4's members that the studios would close and the yoga classes would be cancelled. CorePower internally decided that it did not wish to proceed with the Transaction in the midst of these temporary

---

[264] APA § 3.6(c).

[265] *Mrs. Fields Brand, Inc. v. Interbake Foods*, LLC, 2017 WL 2729860, at *28 (Del. Ch. June 26, 2017).

[266] Tr. 1313:1–5 (Leondakis).

closures and asked Level 4 if it would agree to adjourn the April 1 closing. When

Level 4 refused, and reminded CorePower that there was no contractual exit off the

road to closing, CorePower had a choice. It could have proceeded to close on April 1

as it was contractually obliged to do and then invoke its post-closing remedies, or it

could go "all in" by refusing to close (or otherwise honor the APA) purportedly as a

matter of common law right. Apparently frustrated that Level 4 would not agree to

delay, it abruptly chose the latter course and, by so doing, committed itself to

demonstrating that the temporary closures of Level 4's studios, prompted by

CorePower's own direction, "defeat[ed] the object of the parties in entering into the

contract."[267] The preponderance of the evidence said otherwise.

### d. Lease Amendments—Section 3.6(i)

In Section 3.6(i), Level 4 represented that it had not "amended or terminated

any lease or sublease of real property of the renewals thereof."[268] CorePower started

---

[267] *Mrs. Fields Brand, Inc.*, 2017 WL 2729860, at \*28. *See also* Restatement (Second) of Contracts § 241 (1981) (noting that it is appropriate to consider whether the non-breaching party can be "adequately compensated" for the breach without refusing to perform when determining whether a material breach has occurred). CorePower certainly could have been compensated for any harm caused by the temporary closures post-closing through an indemnification claim or price adjustment. CorePower also argues that Level 4 breached Section 3.6(e) when it permanently closed four of its yoga studios. CPY AB at 71. As CorePower acknowledged in its briefing, however, these permanent closures occurred in October 2020, well after it declared that it would not honor the APA. *Id.*; JX 556 at 13–15.

[268] APA § 3.6(i).

sending letters to its landlord requesting rent abatements on or around March 23, 2020.[269] Level 4 began sending out similar letters prior to the first scheduled closing date, but no lease amendments were effective until April 1, 2020 or later.[270] Despite CorePower's contention to the contrary, seeking lease amendments without CorePower's approval or knowledge was not prohibited by the APA. More to the point, even if seeking rent abatements and favorable rent adjustments to account for the temporary closure of studios breached the APA, the credible evidence does not support a finding that these measures, taken to preserve assets, constituted a material breach of the APA that would justify CorePower walking away from the deal.[271] Here again, the measures were temporary and consistent with CorePower's own mitigation efforts. And any harm flowing from the lease amendments readily and adequately could have been addressed by post-closing remedies.[272]

### e. Material Adverse Effect—Section 3.6(l)

CorePower's invocation of the MAE clause in its material breach case raises the interesting question of whether, having failed to bargain for a provision that

---

[269] Tr. 1316:11–1317:7 (Leondakis); JX 374 at 15.

[270] JX 1020; Tr. 768:19-769:9 (DeCoons).

[271] Tr. 1314:6–20 (Leondakis). Of course, as stated, from Level 4's perspective, it was actually preserving CorePower's assets once the first closing date passed.

[272] See Restatement (Second) of Contracts § 241 (1981).

would make the non-occurrence of an MAE a condition to closing, CorePower must now demonstrate that Level 4 suffered a "material Material Adverse Effect" to justify its refusal to close. Or does any Material Adverse Effect necessarily meet the material breach threshold?

If it were the case that the occurrence of *any* MAE would justify a refusal to close, buy-side transactional planners might well wonder why they have bargained so hard to include express language in their acquisition agreements that makes clear the non-occurrence of an MAE is a condition to closing. In my view, they need not wonder or question whether they've been wasting their time. To justify a refusal to close based on a purported breach of an MAE representation (or covenant) in the absence of an express corresponding condition to close, the buyer must demonstrate that the breach of that representation (or covenant) was material.

This is not redundant. Parties may define an MAE to mean whatever they want it to mean. And one can certainly envision an MAE definition that is triggered in circumstances that do not "go[] to the root or essence of the agreement between the parties, or touch[] the fundamental purpose of the contract and defeat[] the object of the parties in entering into the contract."[273] In such instances, while there might

---

[273] *Mrs. Fields Brand, Inc.*, 2017 WL 2729860, at *28.

be an MAE, there would not be a material breach of the MAE representation or covenant.

Here, for the reasons explained above, there was no MAE and, therefore, there was no material breach of the MAE representation at Section 3.6(l).  To the extent CorePower seeks to excuse its refusal to close on a material breach of this provision, the excuse fails.

### f.  Debt—Section 3.7

CorePower also points to Level 4's application for a PPP loan as evidence that Level 4 was not operating in the ordinary course of business as required by the Ordinary Course Covenant *and* as evidence that Level 4 was in breach of Section 3.7.[274]  Level 4 did not apply for a PPP loan until April 9, 2020.[275]  Thus, Level 4's application for a PPP loan does not support CorePower's assertion that

---

[274] CPY OB at 49.  In Section 3.7 of the APA, Level 4 represents that it "has no Liabilities in respect of Debt that is secured by any Encumbrance on any Acquired Asset or that otherwise could reasonably be expected to become a Liability of the Business except as set forth on Schedule 3.7.  For each item of Debt, Schedule 3.7 correctly sets forth the debtor, the principal amount of the Debt as the date of this Agreement, the creditor and the collateral, if any, securing the Debt.  The Seller has no Liability in respect of a Guarantee of any Liability of any other Person relating to the Business."  APA § 3.7.

[275] JX 326.

Level 4 was not operating in the ordinary course at the time CorePower walked away from the Transaction.[276]

In CorePower's Pre-Trial Brief, it argues that Level 4 breached Section 3.7 of the APA when it accepted a PPP loan.[277]  Again, this alleged breach would have occurred after CorePower walked away from the Transaction and cannot be proffered as evidence to excuse CorePower's failure to close on the First Tranche.

### g. Ordinary Course of Business—Section 5.1

At the risk of intolerable redundancy, Level 4 did not materially breach its Ordinary Course Covenant in a manner that would excuse CorePower's non-performance because, as of April 1, Level 4 was operating in the ordinary course. CorePower's arguments to the contrary are rejected for the same reasons they were rejected when proffered in support of its repudiation excuse.

### E. Level 4 is Entitled to Specific Performance, Damages and Interest

CorePower breached the APA when it refused to close on April 1, 2020, and then fully abandoned the Transaction it had agreed to consummate.  Level 4 claims

---

[276] In seeking the PPP loan, Level 4, once again, was following CorePower's lead. Tr. 1324:8–20 (Leondakis) (confirming that CorePower applied for a PPP loan in March 2020).

[277] D.I. 150 at 17.

it is entitled to specific performance and compensatory damages, in addition to pre-judgment interest on the deal price.[278]  I agree.

Under Delaware law, a party seeking specific performance must establish that "(1) a valid, enforceable[] agreement exists between the parties; (2) the party seeking specific performance was ready, willing, and able to perform under the terms of the agreement; and (3) a balancing of the equities favors an order of specific performance."[279]  The APA expressly provides that specific performance is an appropriate remedy "in the event any of the provisions of this [APA] are not performed in accordance with their specific terms or otherwise are breached or violated."[280]  Our Chancellor recently observed that, "[t]his court has not hesitated to order specific performance in cases of this nature, particularly where sophisticated parties represented by sophisticated counsel stipulate that specific performance would be an appropriate remedy in the event of breach."[281]  I see no basis to hesitate here.

---

[278] Level 4 OB at 99.

[279] *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *32 (Del. Ch. Mar. 30, 2017) (quoting *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009)).

[280] APA § 8.11.

[281] *Snow Phipps*, 2021 WL 1714202, at *51.

The APA was and continues to be a valid contract, and Level 4 is entitled to the declaration it seeks to that effect. Level 4 continues to "stand ready to deliver to CorePower the studio assets it contracted to deliver in the APA."[282] And, as CorePower breached the APA notwithstanding its exercise of the Call Option and its commitment to honor the Call Option Agreement and Call Option Exercise Agreement, the balance of equities decidedly favors Level 4.[283]

According to CorePower, specific performance is impractical in this case because the Transaction was a "significant undertaking" and "never a simple transaction."[284] But, as noted, "[t]his court has not hesitated to order specific

---

[282] Level 4 OB at 95; *see* Tr. 262:15–17, 1396:11–1398:15 (Kenny); Tr. 498:22–499:9, 515:12–518:24 (Jaros); JX 762; JX 763; JX 1019; JX 1020; *see also Osborn*, 991 A.2d at 1161 (argument that a party was not able to perform at some historical point in time did not preclude order of specific performance when party stood ready and willing to perform at the time of judgment).

[283] At trial, Kenny described how the APA contained a noncompete provision that was an "enhanced" version of the noncompete provision in the Franchise Agreement. Tr. 1377:15–13 (Kenny); Franchise Agreement § 15.6; APA § 5.6. According to Kenny, the term of the noncompete was to run from the date of the first closing, and he suggested the Court's specific performance order should account for this by finding that the noncompete term has now expired. Tr. 1381:18–24 (Kenny). There is support for Kenny's position in our law. *See Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *5 (Del. Ch. Mar. 12, 2018) (holding that party's breach of contract excused counter-party's performance of non-compete restrictive covenant). But Level 4's prayers for relief in the Complaint and in the Pretrial Order did not seek an adjustment of the APA's non-compete provision, and so I have no basis to provide that relief here. *See generally,* Complaint Prayers for Relief (no prayer for reformation of or excusal from noncompete); PTO Sec. V (same).

[284] CPY OB at 97.

performance" of transaction agreements like the APA, even when doing so might involve a "significant undertaking."[285] Again, I see no reason to hesitate here.[286] Level 4 will deliver all assets it agreed in the APA to deliver and CorePower will pay what it agreed in the APA to pay for those assets.

Section 2.2 of the APA sets forth the methodology for determining the purchase price associated with each of the staggered closings.[287] Mordaunt followed this methodology and determined that CorePower was to pay Level 4 $6,254,452 as of the closing for Tranche 1, $6,260,934 as of the closing for Tranche 2, and $13,850,773 as of the final closing for Tranche 1 (collectively, the "APA Consideration").[288] Mordaunt's opinion in this regard was credible and not

---

[285] *Snow Phipps*, 2021 WL 1714202, at *51; *id.* at *51 n.565 (collecting cases). *See also Channel Medsystems, Inc. v. Boston Sci. Corp.*, 2019 WL 7293896, at ¶ 4 (Del Ch. Dec. 26, 2019) (ordering specific performance of merger agreement); *Hexion*, 965 A.2d at 763 (same); *In re IBP*, 789 A.2d at 84 (same).

[286] I note that this case does not involve personal services, construction or the like—cases in which this court has been hesitant to supervise a specific performance award. *See, e.g.*, *Ryan v. Ocean Twelve, Inc.*, 316 A.2d 573, 575 (Del. Ch. 1973) ("As a general rule, a court of equity will not order specific performance of a building contract in a situation in which it would be impractical to carry out such an order unless there are special circumstances or the public interest is directly involved."); *Bali v. Christiana Care Health Servs., Inc.*, 1999 WL 413303, at *2–3 (Del. Ch. June 16, 1999) (observing that many courts and the Restatement hold that a contract for personal services typically will not be specifically enforced).

[287] APA § 2.2.

[288] Mordaunt's Report ¶ 150; at p. 116. *See also* Tr. 590:13–592:9 (Mordaunt) (credibly testifying regarding his process for determining the unpaid portion of the purchase price).

meaningfully challenged by CorePower. Thus, CorePower must pay Level 4 the APA Consideration, which, as adjusted, totals $26,366,159.

As "an order of specific performance seldom results in performance within the time the contract requires," "damages for the delay will usually be appropriate."[289] So too here. When CorePower walked-away from the Transaction, Level 4 became a steward of the studio assets.[290] As a steward, Level 4 began taking cost-saving measures to preserve the assets and mitigate damages.[291] From April 1, 2020 through May 31, 2021, Level 4 sustained $3,523,516 in operating losses protecting CorePower's assets.[292] Under the terms of the APA, Level 4 would have captured and incurred any profits or losses up until each closing date for the

---

[289] *Snow Phipps*, 2021 WL 1714202, at *55 (quoting Restatement (Second) of Contracts § 358 cmt. c) (internal quotation marks omitted).

[290] Tr. 493:13–24 (Jaros) ("Q: So let's talk about what happened after April 1, 2020. After CorePower terminated the acquisition, what did Level 4 do with respect to the yoga studios? A. At that point, we became a steward of the asset for CorePower.").

[291] *See Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 11 (Del. Ch.1992) ("While there is a general duty to mitigate damages if it is feasible to do so, a plaintiff need not take unreasonably speculative steps to meet that duty."), *aff'd*, 620 A.2d 856 (Del. 1992). I note that CorePower contends Level 4 *could* have sought CorePower's consent before taking its "good steward" actions. CPY Supplemental Submission at 8. For this proposition, CorePower cites our Supreme Court's decision in *AB Stable*. Here, unlike in *AB Stable* and as described above, there and no provisions in the APA requiring consent and, in any event, the actions taken by Level 4 as the steward of the assets were consistent with Level 4's (and CorePower's) ordinary course of business. Thus, Level 4 did not need to seek permission from CorePower prior to taking actions to mitigate damages.

[292] Tr. at 592:10–593:11 (Mordaunt); Tr. at 508:22–509:22 (Jaros); JX 532; JX 630; JX 680; JX 681.

respective studios to be delivered in each tranche, and CorePower would have captured and incurred the profits and losses from that date forward.[293] Thus, any losses Level 4 incurred as a result of operating the studios after each "Closing Date" passed without a closing (the "Operating Losses") would have been incurred post-closing by CorePower had it adhered to the terms of the APA, and CorePower must bear those losses.

Level 4 will also be awarded pre-judgment interest on the APA Consideration and the Operating Losses at the statutory rate accruing from the date that each payment was due and payable under the APA (or in the case of the Operating Losses, the date the Operating Losses were incurred) until the date of this Memorandum Opinion.[294] At trial and in his report, Mordaunt credibly opined that Level 4 suffered damages by not receiving the purchase price agreed to by the parties at the agreed upon times.[295] As Mordaunt explained, given the staggered closings, it was

---

[293] Mordaunt's Report ¶ 151(b).

[294] *See* 6 *Del. C.* § 2301; *see also Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011) (holding that pre-judgment interest "in Delaware cases is awarded as a matter of right"); 2 Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 16.09[f][1], at 16-136 (2d ed. 2020) ("[T]he Court of Chancery has the authority to grant pre- and post-judgment interest, and to determine the form of that interest. The practice of awarding pre-judgment interest is well accepted in Delaware.") (footnote omitted).

[295] Mordaunt's Report ¶ 150; 594:3–595:18 (Mordaunt) (credibly testifying regarding the methodology and results of his damages calculations).

appropriate to calculate this aspect of the damages either by looking to the statutory pre-judgment interest or by determining what the expected return on the APA Consideration would have been had Level 4 invested the APA Consideration.[296]

In its opening post-trial brief, Level 4 requested "that the Court order CorePower to pay pre-judgment interest on the purchase price and stewardship losses at the statutory rate through the date of payment."[297] Because Level 4 requested that I use pre-judgment interest as a basis to calculate the full extent of its losses both with respect to the APA Consideration and the Operating Losses (resulting in a lower return than the alternative), and because I have found Mordaunt's opinion in this regard to be credible, I am satisfied that an award of pre-judgment interest on the APA Consideration, as of the contractually determined closing dates, adequately compensates Level 4 for the harm caused by CorePower's breach of the APA.[298] Level 4 is also entitled to receive pre-judgment statutory interest on the Operating Losses, which shall be calculated in accordance with Exhibit K-2 to Mordaunt's expert report.[299] Within ten (10) days from the date of

---

[296] Id.

[297] CPY OB at 100.

[298] Mordaunt's Report ¶ 150; Tr. 595:5–9 (Mordaunt) (stating that the amount Level 4 lost out on in expected interest or returns through the date of the trial was $1,550,344 and $3,294,106, respectively).

[299] Mordaunt's Report at p. 120.

this Memorandum Opinion, the parties shall submit a calculation of the statutory pre-judgment interest on the APA Consideration and the Operating Losses, which should make current the calculation submitted by Level 4 as of the start of trial using the same methodology.[300]

Level 4 is also entitled to post-judgment interest, again at the statutory rate, as well as recoverable costs.[301]  Level 4 has failed, however, to support its request for attorney's fees by failing to articulate a basis for the Court to bypass the American Rule.

As a final point, CorePower paid Level 4 several pre-closing payments, including:

- $494,039 to cancel the buildout of the Cancelled Studios, terminate the concomitant Franchise Agreement, and reimburse Level 4;[302]

- $3,212,623 for the acquisition of the Development Studios on November 27, 2019;[303] and

---

[300] *See* Mordaunt's Report ¶¶ 150(b)(ii); 151(c)(ii).  The parties should confer on this calculation in an effort to agree on the number.  This is a mathematical exercise only, and CorePower waives no rights by agreeing to the math.  If the parties cannot agree, then they shall submit competing, simultaneous calculations.

[301] *See Wilmington Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000) (observing that post-trial interest "is a right belonging to the prevailing plaintiff and is not dependent upon the trial court's discretion"); Ct. Ch. R. 54(d) (providing for prevailing party costs).

[302] PTO ¶ 47.

[303] PTO ¶ 46; *see also* APA § 2.2.4; Tr. 1016:15–20 (Wong).

- An unidentified amount to reimburse Level 4 for the cost of building out the Development Studios for the negative cash flow from November 2019 to June 2020 agreed to in APA § 2.2.4.[304]

To clarify, CorePower has paid these amounts and received everything it has bargained for in exchange for these payments. There is no basis to order Level 4 to return them.[305]

## III. CONCLUSION

For the foregoing reasons, my verdict is for Level 4 on its claim for specific performance of the Agreement, damages, pre-judgment and post-judgment interest at the statutory rate and prevailing party costs. CorePower's counterclaims fail. Level 4's counsel shall file, on notice to opposing counsel, a proposed form of final judgment within ten (10) days of the date of this opinion that incorporates the Court's verdict and includes its revised interest calculations.

---

[304] *See* APA § 2.2.4.

[305] I note there is no provision in the APA for reimbursement of pre-closing payments, further highlighting the "one-way" nature of this Transaction. *See* APA; Tr. 983:4–19 (Wong).